UNITED STATED DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

BALJINDER KAUR, ATUL KAMATH,
AVTAR KAUR, BALJEET KAUR, VIMLA
PATEL, VINITA ARORA, MANJIT
SINGH, and KAMEENA BAMBAM,

                  Plaintiffs,

      - against -

ROYAL ARCADIA PALACE, INC.; and
GEORGE RAJU VARGHESE, GEORGE
VARGHESE, ROY MATHEWS, THOMAS
MATHEWS, CARMO LOBO, and TARIQ
LONGI d/b/a MALABAR PALACE,

                 Defendants.

ECF CASE

05-CV-4725 (NGG)(JO)
*(Electronically Filed)*

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PILLSBURY WINTHROP SHAW PITTMAN LLP
Sangita A. Shah (SS7815)
Kenneth A. Newby (KN0546)
Eric Fishman (*of counsel*)
1540 Broadway
New York, NY  10036
(212) 858-1000

ASIAN AMERICAN LEGAL DEFENSE AND
EDUCATION FUND
Kenneth Kimerling (KK5762)
Tushar J. Sheth (TS5672)
99 Hudson Street
New York, NY  10013
(212) 966-6030

*Attorneys for Plaintiffs*

Dated:  July 20, 2007

**Table of Contents**

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

FACTS .................................................................................................................. 2

ARGUMENT  SUMMARY JUDGMENT IS UNWARRANTED.............................. 2

I.  STANDARD OF REVIEW ................................................................. 2

II.  PLAINTIFFS CLAIMS ARE COVERED BY THE FAIR LABOR
STANDARDS ACT............................................................................ 3

  A.  Plaintiffs Have Established Individual Coverage Under the FLSA........... 3
  B.  Plaintiffs Have Established Enterprise Coverage Under the FLSA........... 4

III.  THE INDIVIDUAL DEFENDANTS INDIVIDUAL DEFENDANTS'
ARE PERSONALLY LIABLE FOR UNPAID WAGES UNDER THE
FLSA AND NEW YORK LABOR LAW AS PLAINTIFFS'
EMPLOYERS ..................................................................................... 5

  A.  Defendant George Raju Varghese Was An Employer of Plaintiffs........... 6
  B.  Defendant George Varughese Was An Employer of Plaintiffs ................. 7
  C.  Defendant Roy Mathew Was An Employer of Plaintiffs .......................... 8
  D.  Defendant Thomas Matthews Was An Employer of Plaintiffs ................. 8
  E.  Defendant Carmo Lobo Was An Employer of Plaintiffs........................... 8

IV.  PLAINTIFFS' FLSA CLAIMS ARE TIMELY ..................................... 9

V.  THE LACHES DEFENSE IS INAPPLICABLE.................................. 10

VI.  ROYAL ARCADIA INC. IS A SUCCESSOR TO MALABAR
(UNINCORPORATED), AND IT (INCLUDING ALL OF ITS
INDIVIDUAL OWNERS) IS LIABLE FOR PLAINTIFFS' UNPAID
WAGES AND LOANS ...................................................................... 11

  A.  Royal Arcadia Assumed Malabar's Debt Liability................................... 12
  B.  Royal Arcadia Is a Mere Continuation of Malabar.................................. 14
  C.  Malabar Incorporated Under the Name Royal Arcadia to
Fraudulently Escape Its Obligations to Plaintiffs ..................................... 18
  D.  A *De Facto* Merger Occurred Between Malabar and Royal Arcadia....... 21
  E.  Standard for Successors Liability Advanced by Defendants
Demonstrates Royal Arcadia Is Liable ..................................................... 22

VII.    UNINCORPORATED MALABAR (NOW KNOWN AS ROYAL
        ARCADIA) AND ITS OWNERS DEFRAUDED PLAINTIFFS
        THROUGH MALABAR'S AGENTS ALI KUTTY AND SAYED
        HUSSAIN ........................................................................................... 25

        A.    Plaintiffs Have Been Defrauded by Defendants ....................................... 25
        B.    Defendants Are Liable For Fraud as Owners of the Unincorporated
              Entity Malabar and/or Because of Their Partnership with Ali and
              Sayed ..................................................................................................... 26
        C.    Plaintiffs' Fraud Claims Stemming from Defendants Failure to
              Repay Their Loans Should Not Be Dismissed As Duplicative of
              Their FLSA claims ................................................................................. 30

VIII.   MALABAR (NOW KNOWN AS ROYAL ARCADIA) AND ITS
        OWNERS BREACHED THEIR CONTRACTS TO REPAY
        PLAINTIFFS' BACK WAGES AND LOANS ........................................ 30

        A.    FLSA Does Not Preempt Plaintiffs' Claims for Back Wages and
              Unpaid Loans ......................................................................................... 30
        B.    Plaintiffs' Claims for Unpaid Loans Do Not Violate the Statute of
              Frauds ..................................................................................................... 32
        C.    Plaintiffs' Contracts for the Repayment of Their Back Wages and
              Loans Have Been Breached .................................................................... 32

IX.     PLAINTIFFS' ALTERNATIVE EQUITABLE CAUSES OF ACTION
        FOR UNJUST ENRICHMENT AND *QUANTUM MERUIT* ARE
        MERITORIOUS ................................................................................... 33

        A.    Plaintiffs Assert Their Claims For Equitable Relief In The
              Alternative ............................................................................................. 33
        B.    Plaintiffs' Quantum Meruit Claims should Not Be Dismissed.
              Defendants Are Liable For The Fraudulent Activities Of Malabar .......... 33
        C.    Plaintiffs Should Prevail On Their Alternative Claims For
              Equitable Relief ..................................................................................... 33

CONCLUSION ................................................................................................ 35

500138236v7

# TABLE OF AUTHORITIES

## CASES

*Abdel-Khalek v. Ernst & Young LLP*,
No. 97 Civ. 4514, 1999 U.S. Dist. LEXIS 2369 (S.D.N.Y. Mar. 5, 1999).......................22

*Amico v. County of Monroe*,
No. 03-CV-6097, 2004 WL 2966950 (W.D.N.Y. Dec. 21, 2004)....................................17

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................................................2

*Ansoumana v. Gristede's Operating Corp.*,
255 F. Supp. 2d 184 (S.D.N.Y. 2003)...........................................................................5, 6

*Avery v. City of Talladega, Ala.*,
24 F.3d 1337 (11th Cir. 1994) .......................................................................................31

*Baker v. Dorfman*,
No. 99-Civ-9385, 2000 WL 1010285 (S.D.N.Y. July 21, 2000), *aff'd*, 232 F.3d
121 (2d Cir. 2000*)*.....................................................................................................15, 20

*Beck v. Roper Whitney, Inc.*,
190 F. Supp. 2d 524 (W.D.N.Y. 2001) ...........................................................................21

*Boekemeier v. Fourth Universalist Society*,
86 F. Supp. 2d 280 (S.D.N.Y. 2000).................................................................................5

*Bongat v. Fairview Nursing Care Center Inc.*,
341 F. Supp. 2d 181 (E.D.N.Y. 2004) ............................................................................34

*Care Environmental Corp. v. M2 Technologies., Inc.*,
No. 05 CV 1600, 2006 WL 148913 (E.D.N.Y. Jan. 18, 2006)..................................21, 22

*Cargo Partner AG v. Albatrans Inc.*,
207 F. Supp. 2d 86 (S.D.N.Y. 2001)...............................................................................15

*Case v. Paul Troester Maschinenfabrik*,
139 F. Supp. 2d 428 (W.D.N.Y. 2001) ...........................................................................15

*Chen v. Street Beat Sportswear, Inc.*,
364 F. Supp. 2d 269 (E.D.N.Y. 2005) ............................................................................30

*Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp.*,
596 N.Y.S.2d 435 (App. Div. 1993) ...............................................................................11

*Eisen v. Feder*,
    763 N.Y.S.2d 279 (App. Div. 2003) ...................................................................11

*Figueroa v. Coxline, Inc.*,
    No. 00-Civ-0327, 2001 WL 664560 (S.D.N.Y. June 14, 2001) .......................................21

*First Bank of Americas v. Motor Car Funding, Inc.*,
    690 N.Y.S.2d 17 (App. Div. 1999) ...................................................................25

*In re Flutie N.Y. Corp.*,
    310 B.R. 31 (Bankr. S.D.N.Y. 2004) .............................................................14, 19

*Four Star Capital Corp. v. NYNEX Corp.*,
    No. 93-8974, 1997 U.S. Dist. LEXIS 14519 (S.D.N.Y. Sept. 25, 1997) ..........................29

*Fowler v. Land Management Groupe, Inc.*,
    978 F.2d 158 (4th Cir. 1992) .......................................................................10

*Fox v. Arctic Placer Mining & Milling Co.*,
    229 N.Y. 124 (1920) ................................................................................34

*Gilliam v. Addicts Rehabilitation Center Fund*,
    No. 05 Civ. 3452, 2006 WL 1049352 (S.D.N.Y. Apr. 19, 2006) .....................................5

*Golden Pacific Bancorp v. FDIC*,
    273 F.3d 509 (2d Cir. 2001) .......................................................................34

*Gonzalez v. Chalpin*,
    552 N.Y.S.2d 419 (App. Div. 1990) .................................................................10

*Gonzalez v. Rite Aid of New York, Inc.*,
    199 F. Supp. 2d 122 (S.D.N.Y. 2002) ...............................................................10

*Graham v. James*,
    144 F.3d 229 (2d Cir. 1998) ....................................................................12, 14

*Hammond v. Lowe's Home Centers, Inc.*,
    316 F. Supp. 2d 975 (D. Kan. 2004) ................................................................31

*Ivani Contracting Corp. v. City of New York*,
    103 F.3d 257 (2d Cir. 1997) .......................................................................10

*Karr v. City of Beaumont, Tex.*,
    950 F. Supp. 1317 (E.D. Tex. 1997) ................................................................10

*Kidz Cloz, Inc. v. Officially For Kids, Inc.*,
    320 F. Supp. 2d 164 (S.D.N.Y. 2004) ...............................................................28

iv

*Ladjevardian v. Laidlaw-Coggeshall, Inc.,*
    431 F. Supp. 834 (S.D.N.Y. 1977)................................................................14

*Marshall v. Woods Hole Oceanographic Institute,*
    458 F. Supp. 709 (D. Mass. 1978) .................................................................4

*Miller v. Forge Mench Partnership,*
    No. 00-Civ-4314, 2005 WL 267551 (S.D.N.Y. Feb. 2, 2005) ...................15, 22

*Monroe v. Interlock Steel Co.,*
    487 N.Y.S.2d 1013 (Sup. Ct. 1985)..............................................................15

*New York v. National Sevice Industries, Inc.,*
    460 F.3d 201 (2d Cir. 2006)......................................................................21, 22

*New York v. Westwood-Squibb Pharm. Co.,*
    62 F. Supp. 2d 1035 (W.D.N.Y. 1999) ..........................................................15

*O'Connor v. 11 West 30th St. Restaurant Corp.,*
    Nos. 94 Civ 2951 (LMM), 1995 WL 354904 (S.D.N.Y. June 13, 1995) .........12

*Paramount Film Distributing Corp. v State of New York,*
    30 N.Y.2d 415 (1972) ..................................................................................34

*Pen Pak Corp. v. LaSalle National Bank of Chicago,*
    658 N.Y.S.2d 407 (App. Div. 1997) ..............................................................20

*Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.,*
    262 F. Supp. 2d 251 (S.D.N.Y. 2003)............................................................17

*People's Insurance Co. of China v. Independent Radiator Sales, Inc.,*
    No. 97 CV 7935, 1999 WL 144521 (S.D.N.Y. Mar. 17, 1999).......................18

*Petras v. Johnson,*
    No. 92-Civ-8298, 1993 U.S. Dist. LEXIS 8464 (S.D.N.Y. June 22, 1993) .....30

*Phipps v. Comprehensive Community Development Corp.,*
    No. 00 Civ. 6063, 2005 WL 287413 (S.D.N.Y. Feb. 4, 2005) .........................17

*Price v. Fox Entertainment Group Inc.,*
    No. 05-Civ-5259, 2007 U.S. Dist. LEXIS 6081 (S.D.N.Y. Jan. 26, 2007) ..........10, 11, 12

*Quadrozzi Concrete Corp. v. Mastroianni,*
    392 N.Y.S.2d 687 (App. Div. 1977) ..............................................................11

*Reeves v. Sanderson Plumbing Products,*
    530 U.S. 133 (2000)......................................................................................2

*Sitchenko v. DiResta*,
    512 F. Supp. 758 (E.D.N.Y. 1981) .................................................................29

*Sweatland v. Park Corp.*,
    587 N.Y.S.2d 54 (App. Div. 1992) ...............................................................22

*Talansky v. Schulman*,
    770 N.Y.S.2d 48 (App. Div. 2003) ...............................................................25

*Trans World Airlines, Inc. v. Thurston*,
    469 U.S. 111 (1985)........................................................................................9

*Trustees of the Mason Tenders, District. Council Welfare Fund v. Faulkner*,
    484 F. Supp. 2d 254 (S.D.N.Y. 2007)......................................................27, 28

*United Press v. A.S. Abell Co.*,
    84 N.Y.S. 425 (App. Div. 1903) ...................................................................27

*United States v. Rivieccio*,
    846 F. Supp. 1079 (E.D.N.Y. 1994) .............................................................25

*Western Union Telegraph Co. v. Lenroot*,
    323 U.S. 490 (1945).........................................................................................3

*Williamson v. General Dynamics Corp.*,
    208 F.3d 1144 (9th Cir. 2000) ......................................................................30

*Wirtz v. Savannah Bank & Trust Co.*,
    362 F.2d 857 (5th Cir. 1966) ..........................................................................4

*Yuan ex rel. v. Rivera*,
    No. 96 Civ. 6628, 2000 WL 365036 (S.D.N.Y. Apr. 7, 2000).........................17

*Zheng v. Liberty Apparel Co.*,
    355 F.3d 61 (2d Cir. 2003).............................................................................6

## STATUTES

29 U.S.C. § 255(a) (2007)........................................................................................11

29 U.S.C.A. § 203(j) (West 2006) .............................................................................3

29 U.S.C.A. §203(s)(1)(A)(ii) (West 2006).................................................................4

Fed. R. Evid. 801(d)(2) ...........................................................................................17

N.Y. Gen. Oblig. Law §5-701(a)(1) (McKinney 2007)........................................32, 33

N.Y. C.P.L.R. § 213(1) (West 2006) ........................................................................11

N.Y. C.P.L.R. § 213(2) (West 2006) ...........................................................................11

N.Y. C.P.L.R. § 213(8) (West 2006) ...........................................................................11

N.Y. Lab. Law § 663(3) (West 2007) ...........................................................................11

N.Y. P'ship Law, § 10(1) (McKinney 2007) ...............................................................27

N.Y. P'ship Law, § 27(1) (McKinney 2007) ...............................................................28

**OTHER**

Ellen C. Kearns, THE FAIR LAB. STANDARDS ACT, §3.III.C.1 (2d. ed. 1999) .................................4

Plaintiffs Baljinder Kaur ("Baljinder"), Atul Kamath ("Atul"), Avtar Kaur ("Avtar"), Baljeet Kaur ("Baljeet"), Vimla Patel, Vinita Arora, Manjit Singh ("Manjit"), and Kameena Bambam ("Kameena") (collectively "Plaintiffs") submit this memorandum of law in opposition to the motion of Defendants Royal Arcadia Palace, Inc. ("Royal Arcadia"), George Raju Varghese  ("Raju"), George Varughese ("George"), Roy Mathew ("Roy"), Thomas Matthews ("Thomas"), and Carmo Lobo ("Carmo") (collectively "Defendants")[1] d/b/a/ Malabar Palace ("Malabar") for summary judgment.

## PRELIMINARY STATEMENT

Defendants' motion for summary judgment (the "Motion") is an exercise in futility.  The Motion makes apparent that four critical issues of material fact are in dispute:  (i) who owned Malabar; (ii) whether the economic reality of Plaintiffs' employment at Malabar made Defendants employers under the Federal Labor Standards Act (the "FLSA") and New York labor law; (iii) whether Royal Arcadia is a successor to Malabar; and (iv) whether the Defendants actions (either directly or indirectly) constituted a fraud upon Plaintiffs.  These factually sensitive issues can only be resolved by a jury.

Defendants' version of events is an ever changing, moving target.  For example, Defendants produced a document prepared by Royal Arcadia's 30(b)(6) witness indicating that they invested more than a half million dollars in loans to Malabar (as they told Plaintiffs when Malabar was open).  During depositions, George claimed the money loaned to Ali was for the purchase of a home in India while also admitting the money given to Ali was for Malabar.  Carmo claimed he loaned money to George to help Malabar, while Raju claims he did not know who the money was being loaned to or what it was going to used for.  As another example, during depositions Defendants claimed that they had no idea that Malabar would close in 2003, but months prior to Royal Arcadia signing a lease of

---

[1]  Notably, Defendants' partner Tariq Longi did not move for summary judgment.

for restaurant in September 2003, it was engaged in lease negotiations with the landlord.  During these negotiations the landlord testified that Royal Arcadia agreed to pay Malabar's lease arrears, thereby assuming the debts of the predecessor company.  Finally, while denying it in this litigation, Defendants admitted (either by express words or conduct) to being owners of Malabar when it was in operation.  Such contradictory testimony highlights the need for a jury trial.

Notably, Defendants do not dispute that Plaintiffs worked for Malabar, were duped by two of its owners into making $36,000 in loans to the restaurant, were paid only intermittently and not paid for over time, have never been paid their loans and unpaid wages, and have no other recourse of recovery other than Defendants (two of Defendants' business partners fled the country).  In short, Defendants do not dispute that Plaintiffs are owed a substantial sum of money based on their Complaint, they only dispute that they are the ones who should be made to pay.  As shown below, the vast amount of evidence in this case demonstrates that Defendant – former owners and managers of Malabar – should be held liable for the monies owed to Plaintiffs.

**FACTS**

Plaintiffs further refer the Court to their Counter-Statement of Facts submitted herewith.[2]

**ARGUMENT**

**SUMMARY JUDGMENT IS UNWARRANTED**

I.   **STANDARD OF REVIEW**

In deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).  Judges should not weigh the evidence and determine the truth of the matter, but should determine whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986).

---

[2]  Citations herein refer to the Exhibits annexed to the Counter-Statement and Facts submitted herewith.

500138236v7

## II.       PLAINTIFFS CLAIMS ARE COVERED BY THE FAIR LABOR STANDARDS ACT

In order for the FLSA to apply to Malabar, the Plaintiffs must establish that the requirements for *either* individual *or* enterprise coverage have been met.  Here, Plaintiffs have demonstrated coverage under both theories.

### A.       Plaintiffs Have Established Individual Coverage Under the FLSA

Despite Defendants' unsupported conclusion that there is no evidence that Malabar engaged in interstate commerce, Def. Br. at 3, Malabar did indeed do so.  Notably, Defendants' counsel failed to explore this issue at any of the depositions of the seven Plaintiffs.  Had they simply been asked, Plaintiffs would have confirmed that Malabar was involved in the production of goods for interstate commerce.  Malabar cooked and manufactured products such as paratha (an Indian flatbread) for sale to various vendors both inside and outside of the State of New York, including in Connecticut and New Jersey.  *See* Atul Decl. at ¶¶ 3-5.  As an employee of Malabar, Plaintiff Atul personally delivered Malabar goods to these locations.  *Id*. at ¶ 6.

Defendant Tariq Longi ("Longi") admitted that he allowed Malabar employees to use his Ford Minivan for "deliveries" and other activities.  *See* Longi Tr. at 33-35.  Longi also allowed Malabar to borrow his Montero Jeep for business.  *Id.*  However, he was unable to provide any further details about the use of these vehicles.  *Id.* at 36-39.  Defendants, therefore, cannot credibly deny Malabar's involvement in interstate commerce.  Indeed, Defendants' claims that they were merely "customers" of the restaurant, further undermines their ability to contradict any of the Plaintiffs testimony concerning the operations of the restaurant, including whether Malabar engaged in interstate commerce.  Def. Br. at 12.

Furthermore, the FLSA protects each Plaintiff because each of Plaintiffs' employment positions (as cooks, delivery persons, and restaurant staff) at Malabar was undoubtedly "closely related" or "directly essential" to the production of these food goods for interstate commerce.  *See* 29 U.S.C.A. § 203(j); *Western Union Tel. Co. v. Lenroot*, 323 U.S. 490, 503 (1945) (FLSA coverage

3

includes "every step in putting the subject of commerce," including "all steps, whether manufacture or not, which lead to readiness for putting goods into the stream of commerce."); Ellen C. Kearns, THE FAIR LAB. STANDARDS ACT, §3.III.C.1 (2d. ed. 1999) (with respect to the production of goods for interstate commerce, covered employees include those involved in manufacturing, accounting, clerical, administrative, management or any other duties related to handling or transporting of the goods) (citations omitted).  As such, Plaintiffs demonstrate that they are each individually covered under the FLSA.

     **B.**     **Plaintiffs Have Established Enterprise Coverage Under the FLSA**

Plaintiffs claims are also covered by the FLSA because Malabar is subject to enterprise coverage.  Where enterprise coverage is established, *all* employees of the business are covered under the FLSA.  Kearns, at §3.VII.A (citations omitted).

Defendants misstate the standard for enterprise coverage under the FLSA as:  the business must have "annual gross sales of over $500,000."  Def. Br. at 3.  The FLSA actually defines an enterprise as a business engaged in commerce or in the production of goods for commerce whose "annual gross volume of sales made *or business done* is not less than $500,000."  29 U.S.C.A. §203(s)(1)(A)(ii) (West 2006) (emphasis added).  In *Wirtz v. Savannah Bank & Trust Co.*, 362 F.2d 857, 862-63 (5th Cir. 1966), the Fifth Circuit held in determining the amount of "business done," the calculation may include more than just sales numbers.  For example, it may include interest on loans and securities.  Similarly, investment income should be included in the dollar amount of the volume of business.[3]  Indeed, in the *Boekemeier* case, cited by defendants, the Southern District of New York

---

[3]    *See Marshall v. Woods Hole Oceanographic Inst.*, 458 F. Supp. 709, 718 (D. Mass. 1978) (sums of money received from governmental and non-governmental sources to conduct oceanographic research included for purposes of meeting the statutorily required amount of "annual gross volume of business done").

court suggested that non-business sources of income such as investment income that is "sufficiently related" to the business income should be included in the statutory amount.[4]

As George testified, he obtained at least $523,553.75 in loans for Malabar and produced (albeit by "mistake") a chart showing these amounts.  *See* George Tr. at 70-76; and Ex. Q (DEF000298) (Malabar chart entitled "Loans & Interest Payments").  Finally, despite Defendants' suggestion otherwise, the true total gross sales of Malabar is unknown.[5]  George, Malabar's accountant, claims not have any balance sheets or other accounting records showing the total investment income for Malabar.  As such, all employees of Malabar (including each of the Plaintiffs) are also covered under the FLSA "enterprise" standard for coverage.

## III.   THE INDIVIDUAL DEFENDANTS INDIVIDUAL DEFENDANTS' ARE PERSONALLY LIABLE FOR UNPAID WAGES UNDER THE FLSA AND NEW YORK LABOR LAW AS PLAINTIFFS' EMPLOYERS

The evidence demonstrates that the individual Defendants may be liable as Plaintiffs' employers under the FLSA and New York labor law.  *First*, since Malabar, which was undisputedly Plaintiffs' employer, is subject to the FLSA, (discussed above, *supra*, Section II) Defendants may be held liable under the FLSA and New York labor laws as owners of an unincorporated entity.  *See* Section VII. B. *infra*.  *Second*, discussed more fully below, individuals may be held personally liable for wage and hour violations if they personally qualify as employers under both the FLSA and New York Labor Law.  *Ansoumana v. Gristede's Oper. Corp.*, 255 F. Supp. 2d 184, 192 (S.D.N.Y. 2003). As Defendants properly note, to determine whether an individual is an employer under the FLSA and

---

[4]   *Boekemeier v. Fourth Universalist Soc'y*, 86 F. Supp. 2d 280, 286 (S.D.N.Y. 2000) ("[T]he Court must determine whether other sources of income, including charitable income, investment income, income from the gain on sale of investments, and miscellaneous income are sufficiently related to the Church's business income to warrant inclusion in the gross volume amount.")

[5]   The alleged Malabar tax records produced by George are inadmissible evidence.  They are uncertified, unsigned records, that have not been compared against any of Malabar's actual tax filings with the IRS.  George Tr. at 78. Moreover, George never filed those copies of the tax records with the IRS.  *Id*.  Indeed, the alleged Malabar tax records are the subject of a motions *in limine* that is presently *sub judice*.  (Defendants failed to submit an opposition to that motion.)  As such, there is no way to verify their authenticity and they cannot be relied upon for summary judgment purposes.

New York Labor Law, the Second Circuit will examine the "economic reality" of the relationship between the defendant and the plaintiff.[6]

The "economic reality" test accesses whether the alleged employer:

    (1)    had the power to hire and fire the employees,

    (2)    supervised and controlled employee work schedules or conditions of employment,

    (3)    determined the rate and method of payment, and

    (4)    maintained employment records.

*Id*. (citation omitted).  None of these factors is dispositive; instead, the Court considers the totality of the circumstances.  *Id*.  Additionally, evidence that tends to establish employer status that falls outside of the listed factors is admissible and should be considered.[7]

Under these standards each of the individual Defendants were Plaintiffs' employers and are liable for their unpaid wages.[8]  The evidence below illustrates the numerous issues material fact which exist as to whether these were Plaintiffs' employers.  Accordingly, summary judgment with respect to the personal liability of each of the Individual Defendants must be denied.

### A.    Defendant George Raju Varghese Was An Employer of Plaintiffs

The evidence raises a material issue of fact as to whether Defendant Raju was one of Plaintiffs' employers.  Defendant Raju was introduced to Plaintiffs as one of the bosses and they were instructed to "take care of them well."  Manjit Tr. at 60-61; Avtar Tr. at 93, 98, 102.  Raju told Singh "[t]his is also *my restaurant*.  I've given $400,000 for [Malabar]."  Manjit Tr. at 63 (emphasis added).  Further, the employees were instructed not to charge their bosses, including Raju, for their meals at the restaurant.  Atul Tr. at 52-54.  Therefore, Raju never paid for his meals at Malabar, nor

---

[6]    *See Gilliam v. Addicts Rehab. Ctr. Fund*, No. 05 Civ. 3452, 2006 WL 1049352, at *2 (S.D.N.Y. Apr. 19, 2006) (citing *Herman v. RSR Sec. Servs.. Ltd.*, 172 F.3d 132, 139 (2d. Cir. 1999)).

[7]    *See Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71 (2d Cir. 2003) (noting that evidence outside the "economic reality" test factors that are related to employer status should be considered by courts).

[8]    Moreover, as partners in the unincorporated association doing business under the name Malabar, the Defendants are personally liable for all of the Malabar's debts, including Plaintiffs' unpaid wages.  *See* Section VIII, *infra*.

did he give any tips to the waiters who served him.  *Id.*  Employees were instructed to "give him everything he asks for."  Kameena Tr. at 116.

At least one Plaintiff was assured by Raju that he would get paid.  *See* Manjit Tr. at 50. (When Manjit complained that his Malabar checks bounced, he showed the checks to Defendants Longi and Raju and was assured that the money was not "going anywhere.")  Another employee also repeatedly spoke with Raju about his failure to receive his paychecks.  In response, Raju would "always make a very pleasurable face" and say that we "can't give it to you right now."  *See* Atul Tr. at 168.  He also would answer that "maybe this week the business is not good.  Maybe next week you get paid in advance week."  Atul Tr. at 31.

Raju also asked employees whether they were satisfied with their jobs and the salaries they were earning.  *See* Kameena Tr. at 52-53.  Raju visited Malabar "at least six times a month."  Atul Tr. at 29.  During those visits, Raju would give instructions to employees including how to improve the products and make them "presentable."  Atul Tr. at 29-30.

Other evidence of Raju's employer status includes his actions when the Plaintiffs attempted to recover their unpaid wages by taking items from the restaurant.  Raju and others showed up to protect the items and kept the employees from taking anything.  Atul Tr. at 40-42.  Raju also promoted Malabar with his customers at his jewelry store.  Atul Tr. at 39-40.

### B. Defendant George Varughese Was An Employer of Plaintiffs

Defendant George was also introduced to Plaintiffs as one of the owners and partners of Malabar.  Avtar Tr. at 98; Baljeet Tr. at 47-48.  Further, the employees were instructed not to charge their bosses, including George, for their meals at the restaurant.  Atul Tr. at 52-54.  George visited Malabar several times per month and gave instructions to employees.  Atul Tr. at 29-31. When employees sought employment related documents such as their W2s and 1099 tax forms, they were instructed to speak with George.  Atul Tr. at 151.  Employees also complained to George when they were not getting paid.  Atul Tr. at 165-67.  Indeed, Carmo testified that George maintains all business

7

documents for any businesses in which he has an interest.  Carmo Tr. at 37-38.

Other evidence of George's employer status includes his actions when the Plaintiffs attempted to recover their unpaid wages by taking items from the restaurant.  George and others showed up to protect the items and kept the employees from taking anything.  Atul Tr. at 40-42.

### C.    Defendant Roy Mathew Was An Employer of Plaintiffs

Defendant Roy Mathew (a.k.a. "Sam")[9] was also introduced to Plaintiffs as one of the owners and partners of Malabar.  Avtar Tr. at 98.  The employees were instructed not to charge their bosses, including Roy, for their meals at the restaurant.  Atul Tr. at 52-54; Avtar Tr. at 13.  Roy also said that he was an owner of Malabar.  Kameena Tr. at 121-22; Avtar Tr. at 98.  At least one employee interviewed for employment at Malabar with Roy.  Avtar Tr. at 30-33.  Roy also set employees' pay rates and schedules.  Avtar Tr. at 33, 35, 38-39.  Moreover, Roy was at Malabar on a daily basis and during that time instructed employees regarding what to wear, what type of work to perform, and how to handle daily tasks.  Kameena Tr. at 58-59, 124-25, 173, 180.

Other evidence of Roy's employer status includes his actions when the Plaintiffs attempted to recover their unpaid wages by taking items from the restaurant.  Roy and the other Defendants showed up to protect the items and kept the employees from taking anything.  Atul Tr. at 41-42.

### D.    Defendant Thomas Matthews Was An Employer of Plaintiffs

Defendant Thomas Matthews was also introduced to Plaintiffs as one of the owners and partners of Malabar.  Baljinder Tr. at 52-54, 111.  Further, the employees were instructed not to charge their bosses, including Thomas, for their meals at the restaurant.  Atul Tr. at 52-54.  Thomas also said he was the manager of the restaurant.  Kameena Tr. at 60.

### E.    Defendant Carmo Lobo Was An Employer of Plaintiffs

Defendant Carmo Lobo was also introduced to Plaintiffs as one of the owners and partners of Malabar.  Avtar Tr. at 101; Baljinder Tr. at 52-54.  In fact, Carmo was introduced to employees as a

---

[9]  *See* Atul Decl. at ¶ 8.

"partner" of Malabar.  Baljeet Tr. at 111.  Like the other bosses, Carmo never paid for his meals at

the restaurant.  Carmo Tr. at 84-85, 88-89.  Carmo gave the kitchen staff instructions on a daily basis.

Kameena Tr. at 22-23, 117; Atul Tr. at 80-81.  Carmo even admitted to going into the kitchen on at

least one occasion and giving instructions to kitchen staff.  He further testified that it is not his habit

to visit the kitchen of a restaurant and provide instructions to staff.  Carmo Tr. at. 93-94.  This makes

sense when one is not the manager of the restaurant. However, highlighting his status as manager at

Malabar, Carmo would go down to the kitchen frequently and direct the kitchen staff to prepare food

for him.  Kameena at 117.  Carmo also asked employees if they were happy with their positions and

salaries.  Kameena Tr. at 118.  Further demonstrating that he was an owner of Malabar, Carmo had

discussions with employees about improving the business and what type of equipment to purchase.

Atul Tr. at 78-82.  He also had conversations with the construction workers about the renovations.

Atul Tr. at 84-85.

 Other evidence of Carmo's employer status includes his actions when the Plaintiffs attempted

to recover their unpaid wages by taking items from the restaurant.  Carmo and others showed up to

protect the items and kept the employees from taking anything.  Atul Tr. at 41-42.

 The evidence here demonstrates that there is, at the very least, issues of fact as to whether

each the Individual Defendants were Plaintiffs' employers under the "economic reality" test

employed by the New York courts.

## IV. PLAINTIFFS' FLSA CLAIMS ARE TIMELY

 If an employer either knew or showed reckless disregard as to whether its conduct was

prohibited under FLSA, a three-year limitations period is applicable.  *See Trans World Airlines, Inc.*

*v. Thurston*, 469 U.S. 111 (1985) (holding that the FLSA requires that a civil enforcement action be

commenced within two years after the cause of action accrued, except that a cause of action arising

out of a "willful" violation may be commenced within three years).  Here, the plaintiffs filed their

FLSA claims on October 6, 2005, less than three years of their accrual.  *See* Compl. (Def. Ex. S).

Based upon the evidence, a reasonable juror could infer that the Defendants here knew that their conduct was violating the FLSA.  *See infra* Section VI.C. (discussing Royal Arcadia's fraudulent incorporation to escape obligations) and Section VII.A. (discussing Defendants efforts to defraud Plaintiffs out of their unpaid wages and loans).

With respect to the extended statute of limitations factor under FLSA, federal courts have held that "[w]illfulness is a fact issue for the jury." *Karr v. City of Beaumont, Tex.*, 950 F. Supp. 1317, 1325 (E.D. Tex. 1997); *Fowler v. Land Mgmt. Groupe, Inc.*, 978 F.2d 158, 163 (4th Cir. 1992). Where, like here, the plaintiffs have set forth facts from which a reasonable jury could infer that the defendants willfully or recklessly disregarded conduct prohibited by FLSA, summary judgment should be denied.[10]

## V.    THE LACHES DEFENSE IS INAPPLICABLE

 In complete disregard of relevant law, Defendants assert that the doctrine of laches bars Plaintiffs from bringing their claims because Plaintiffs did not initiate this action until two years after the termination of their employment at Malabar.  Def. Br. at 14.  The laches defense bars a plaintiff's claim only when the plaintiff is responsible for an "unreasonable and inexcusable delay [resulting] in prejudice to the defendant."  *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997).  This equitable defense is inapplicable to actions seeking damages at law with express statutes of limitations governing the timeliness of each claim.[11]  The legislature's judgment as to the timeliness of a particular claim should not be overruled.  *See Price,* 2007 U.S. Dist. LEXIS 6081, at *12 *quoting Ivani Contracting*, 103 F.3d at 260.

---

[10] *Gonzalez v. Rite Aid of New York, Inc.*, 199 F. Supp. 2d 122, 134 (S.D.N.Y. 2002) (summary judgment with respect to statute of limitations issue denied where reasonable juror could infer that the sophisticated business Rite Aid knew its conduct violated the FLSA).

[11] *See Price v. Fox Entm't Group Inc.*, No. 05-Civ-5259, 2007 U.S. Dist. LEXIS 6081, at *11 (S.D.N.Y. Jan. 26, 2007); *quoting Ivani Contracting*, 103 F.3d at 260 (reversing summary judgment granted to defendant on the ground that laches is no bar to a plaintiff's timely federal statutory claim for legal relief); *Gonzalez v. Chalpin,* 552 N.Y.S.2d 419, 420 (App. Div. 1990) (holding that laches is no bar to a suit for "breach of contract brought within the applicable Statute of Limitations").

In this action, there was no unreasonable delay as Plaintiffs claims timely filed their claims, within two years and two months of their accrual.[12]  Moreover, the defense of laches is inapplicable as a bar to the relief sought by Plaintiffs, money damages at law.

Finally, Defendants failed to show any prejudice whatsoever.  They disingenuously claim that Plaintiffs' delay prevented their filing of a cross-claim against their former business partners Ali and Sayed.  Yet, they themselves have acknowledged that Ali and Sayed mysteriously fled the country in August 2003 all the while Defendants still promised Plaintiffs they would be paid. Manjit Tr. at 99; Avtar Tr. at 77; Baljeet Tr. at 34; Baljinder Tr. at 76.  Defendants also claim that if Plaintiffs filed suit when Malabar closed in August 2003, Defendant would have searched the premises for "documents, including Malabar's payroll, before renovating the premises." Def. Br. at 15.  This argument overlooks the fact that prior to conducting any renovations, Defendants were on notice of Plaintiffs' claims and therefore had a duty to preserve all relevant documents.  Moreover, George testified that he prepared the payroll taxes for Malabar and he should still have those records.

## VI.  ROYAL ARCADIA INC. IS A SUCCESSOR TO MALABAR (UNINCORPORATED), AND IT (INCLUDING ALL OF ITS INDIVIDUAL OWNERS) IS LIABLE FOR PLAINTIFFS' UNPAID WAGES AND LOANS

Under New York law a company may be held liable for the debts of another company when "(1) it expressly or impliedly agrees to assume the liabilities;  (2) there was a merger or consolidation of the two firms; (3) the purchasing corporation is merely a continuation of the selling corporation or (4) the transaction is entered into fraudulently in order to escape liability for such debts." *O'Connor v. 11 West 30th St. Rest. Corp.*, Nos. 94 Civ. 2951, 1995 WL 354904, at *8 (S.D.N.Y. June 13,

---

[12]  Plaintiffs timely brought their First, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Causes of Action for fraud, violations of New York State labor law, breach of contract, unjust enrichment, and quantum meruit under the applicable six-year statutes of limitations.  *See* N.Y. C.P.L.R. § 213(8) (West 2006) (fraud); *Quadrozzi Concrete Corp. v. Mastroianni*, 392 N.Y.S.2d 687, 688 (App. Div. 1977) (fraud); N.Y. LAB. Law § 663(3) (West 2007) (New York State labor law claims); N.Y. C.P.L.R. § 213(2) (breach of contract); *Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp.*, 596 N.Y.S.2d 435, 437 (App. Div. 1993) (unjust enrichment); *Eisen v. Feder*, 763 N.Y.S.2d 279, 280 (App. Div. 2003) (quantum meruit); *see also* N.Y. C.P.L.R. § 213(1) (prescribing a six-year statute of limitations for any "action for which no limitation is specifically prescribed by law").  Likewise, Plaintiffs timely filed their Second and Third Causes of Action under the FLSA's three-year statute of limitations.  *See* 29 U.S.C. § 255(a) (2007).

1995).  The cases in which successor liability is established are not limited solely to defendants of the corporate form.  Indeed, "the traditional rule of corporate successor liability and the exceptions to the rule are generally applied regardless of whether the predecessor or successor organization was a corporation or some other form of business organization."  *Graham v. James*, 144 F.3d 229, 240 (2d Cir. 1998).

In *Graham*, the plaintiff sued an individual who conducted business under the assumed name Night Owl Computer Service.  *See id*. at 233.  Shortly thereafter, the individual incorporated the sole proprietorship under the name Night Owl's Publisher, Inc.  The Second Circuit remanded the case to the district court to resolve whether the plaintiff established a claim for successor liability under the mere continuation exception.  *See id*. at 240.  As demonstrated below, there are numerous issues of disputed fact regarding whether Royal Arcadia is a successor to the unincorporated entity Malabar.  Defendants' motion for summary judgment on this theory is demonstrably frivolous.

### A.      Royal Arcadia Assumed Malabar's Debt Liability

In *O'Connor*, the plaintiff alleged that the defendant corporation, like Royal Arcadia, was responsible for the debts and liabilities of its predecessor because it impliedly agreed to assume the predecessor's liabilities by paying its arrears in rent.  1995 WL 354904, at *8.  Assuming that the plaintiff had evidence of this implied assumption of responsibility, the court denied the defendant's motion to dismiss.  *Id.*

Here, overwhelming evidence exists that Royal Arcadia expressly assumed the liabilities of Malabar by paying Malabar's rental arrears.  Albert Sang, President of Y.W. Sang Realty Corp. and landlord for the Restaurant, testified that in connection with allowing the Restaurant to execute a new lease under the name Royal Arcadia, he made an express agreement with George Varughese (Royal Arcadia's 30(b)(6) witness) for Royal Arcadia to pay Malabar's rental arrears.  Sang Tr. at 21-23, 44-45.  Mr. Sang confirmed that thereafter Royal Arcadia did, in fact, make this payment.  Sang Tr. at 23-24.

To hide this payment, George Varughese had Mr. Sang sign a Supplemental Rider to the Lease, specifying a $5,000 payment for nine months for all of the fixtures, furniture, and equipment located at the restaurant.  Sang Tr. at 41-47.  However, Mr. Sang testified the real purpose of the Supplemental Rider was to provide Royal Arcadia with additional time to pay a portion of Malabar's lease arrears.  Sang Tr. at 36-37.  Defendants confirmed this fact by their admission that "Royal Arcadia did *not* agree to pay Sang $45,000 for the use of the equipment that was left on the premises."  Def. 56.1 at 11, ¶88 (emphasis added).

Defendants' contention that this evidence is inadmissible hearsay (because it amounts to a "conversation between Sang and his attorney regarding Defendants' payment of Malabar's back") is wrong for a variety reasons.  Def. Br. at 17, n.6.  *First*, Sang testified as to his understanding of the real purpose behind the Supplemental Rider, not what his attorney told him the Supplemental Rider was being executed for:

> Q:   What did you understand the purpose behind you signing this document and/or Royal Arcadia signing this document to be?
>
> A:   *I'll sign it for the back rent*.  Willing to give him to pay in nine months. (sic).

Sang Tr. at 44-45 (emphasis added).  *Second,* Sang also testified that George, not Sang's attorney, told him Royal Arcadia would pay Malabar's back rent, which – even if hearsay – is admissible as an admission by a party opponent.  Sang Tr. at 21-23.  *Third*, when Defendants' counsel asked Mr. Sang what his attorney said the Supplemental Rider was for, Plaintiffs' counsel objected and the question was rephrased to inquire solely about Mr. Sang's understanding.  Sang Tr. at 38-39.  In short, Mr. Sang never testified regarding any conversation between him and his attorney.  Accordingly, all of the evidence that Royal Arcadia expressly assumed Malabar's liabilities is admissible.

Royal Arcadia also impliedly assumed Malabar's debt of unpaid wages and loans owed to Plaintiffs. "While no precise rule governs the finding of implied liability, the authorities suggest that the conduct or representations relied upon by the party asserting liability must indicate an intention

13

on the part of the [successor] to pay the debts of the [predecessor]." *Ladjevardian v. Laidlaw-Coggeshall, Inc.*, 431 F. Supp. 834, 839 (S.D.N.Y. 1977) (denying defendant's motion for summary judgment because a genuine issue of material fact existed as to whether defendant impliedly assumed the liability of its predecessor).

Several factors must be considered in determining whether to hold a successor liable for the debts of its predecessor under the implied assumption of liability theory. *First*, "the effect of the transfer upon creditors of the predecessor corporation" must be evaluated. *Id.* A finding of implied assumption of liability is more likely in cases in which the predecessor ceases to operate after the transfer or sale of assets. *Id.* at 840. Here, it is undisputed that Malabar ceased operating after Royal Arcadia took possession of the restaurant and all of its assets. Atul Decl. ¶ 7 (Malabar closed on August 14, 2003); (Royal Arcadia took possession immediately); Ex. R (Royal Arcadia lease signed on September 30, 2003). *Second*, courts consider any admissions of liability made by "officers or other spokesmen of the successor corporation." *Id.* Here, the President of Royal Arcadia (the successor corporation), Raju Varghese, promised Plaintiffs payment of their unpaid wages and loans. Raju told Manjit Singh "Don't worry. Everything will be all right. You'll get your money." Manjit Tr. at 98-99. Accordingly, Royal Arcadia should be held liable for the debts of Malabar because Royal Arcadia expressly and impliedly assumed Malabar's liability.

### B.      Royal Arcadia Is a Mere Continuation of Malabar

When a successor company is a "mere continuation" of the predecessor company, successor liability may be found. *See Graham*, 144 F.3d at 240. A company is a "mere continuation" of another when: (1) there is only one corporation in existence, (2) after the transfer of assets, (3) with a common identity of stockholders and directors between the successor and predecessor corporations.[13]

---

[13] *See id., In re Flutie N.Y. Corp.*, 310 B.R. 31, 54-55 (Bankr. S.D.N.Y. 2004) (holding the successor corporation liable because the successor conducted business under the name of the predecessor, the successor was controlled by the same individual that controlled the predecessor, the successor performed essentially the same business, and retained similar customer lists).

This theory targets successor entities that function merely as "a 'new hat for the seller'" (*Cargo Partner AG v. Albatrans Inc.*, 207 F. Supp. 2d 86, 95 (S.D.N.Y. 2001)) and prevents debtors from escaping their liabilities through some form of corporate reorganization.[14]   In fact, Plaintiffs advice when sufficient evidence that the defendant corporation is a mere continuation of its predecessor, as is shown below, federal courts do not hesitate to grant summary judgment in favor of plaintiffs.[15]

The elements of the mere continuation theory are easily satisfied.  Regarding the first element, there is no dispute between the parties that in August 2003 the restaurant ceased operating under the name Malabar after two of its owners fled the country and Royal Arcadia assumed possession of the restaurant.  Def. 56.1 at 11, ¶¶83-86.  The only corporation in existence since September 2003 has been Royal Arcadia.  Def. 56.1 at 11, ¶85.

Regarding the second element, the use of the predecessor's assets by the successor is enough to establish this element.[16]  When two of the Defendants' business partners fled the country, nothing was taken from the restaurant.  Atul Decl. at ¶ 7.  All of Malabar's assets located at the restaurant were transferred to Royal Arcadia, including:  fixtures, furniture, apparatus, and equipment.  Ex. S

---

[14]  *Case v. Paul Troester Maschinenfabrik*, 139 F. Supp. 2d 428, 431-34 (W.D.N.Y. 2001) (denying defendant's motion for summary judgment on the ground that plaintiff submitted sufficient evidence of a genuine question of material fact regarding defendant's role as the mere continuation of its predecessor); *see also Monroe v. Interlock Steel Co.*, 487 N.Y.S.2d 1013, 1015 (Sup. Ct. 1985) (denying defendant's motion for summary judgment).

[15]  *See Baker v. Dorfman*, No. 99-Civ-9385, 2000 WL 1010285, at *6, *10 (S.D.N.Y. July 21, 2000) (granting summary judgment in plaintiff's favor and holding defendant liable under the mere continuation theory of successor liability), *aff'd*, 232 F.3d 121 (2d Cir. 2000); *accord Miller v. Forge Mench P'ship*, No. 00-Civ-4314, 2005 WL 267551, at *6-14 (S.D.N.Y. Feb. 2, 2005) (granting plaintiff's motion for summary judgment and holding defendant liable under the mere continuation theory of successor liability).

[16]  In *Baker v. Dorfman*, the court held that the plaintiff established the mere continuation exception.  2000 WL 1010285, at *6.  The opinion did not refer to any evidence of a specific transfer or purchase of assets.  The court noted that the successor "continues his former law practice, operating . . . with the benefit of [the predecessor's] prior business assets, clients, staff and goodwill."  *Id.* (finding successor liability under the mere continuation exception).  Similarly, the use of assets satisfies the "continuity of assets" element of the "substantial continuity" doctrine.  *See New York v. Westwood-Squibb Pharm. Co.*, 62 F. Supp. 2d 1035, 1039 (W.D.N.Y. 1999) (holding the successor entity liable).

(Supplemental Rider) at 000028; George Tr. at 180.  Royal Arcadia then made some renovations to the restaurant, but it continued, and continues to this day, to use Malabar's equipment.[17]

Defendants' justification for the use of these assets is that they "compensate[d] the landlord for all the equipment" (George Tr. at 180).  This contention is also belied by the fact that Defendants disguised this "compensation" as payment for rental arrears.[18]  They also argue all restaurants use the same equipment (Def. Br. at 17); however, such a contention does not negate that Royal Arcadia's *use of this equipment* satisfies the second element of the mere continuation theory.  In short, whether transferred by licensing agreement (as Defendants contend) or because, in fact, it was Royal Arcadia's equipment (as Plaintiffs contend), there is no dispute that Malabar's assets were transferred to Royal Arcadia.

The third element, a common identity of stockholders and directors between the successor and predecessor corporations, is easily established.  Royal Arcadia and Malabar were owned by substantially the same individuals:  George Varughese, George Raju Varghese, Carmo Lobo, Thomas Mathews, and Roy Mathew.  It is undisputed that George, Raju, Carmo, and Thomas are owners of Royal Arcadia.  Aff. Varughese ¶4; Aff. Raju ¶4; Aff. Lobo ¶3; Aff. Mathews ¶3; George Tr. at 13.  Roy Mathew claimed to be an owner of the restaurant when Malabar closed.  Baljinder Tr. at 73-74.  While Defendants deny ownership of Malabar, despite investing over a half million dollars into the restaurant (George Tr. at 73-76; Ex.Q (loan chart)), the evidence otherwise is overwhelming.

All of the defendants have admitted they were owners of Malabar when it was in operation, either by their words or their conduct.  Raju admitted he was an owner of Malabar telling Plaintiff Singh "[t]his is also *my restaurant*.  I've given $400,000 for [Malabar]."  Manjit Tr. at 63.  Lobo

---

[17] George Tr. at 180-82, 188-92 (admitting Royal Arcadia used the equipment purportedly abandoned by Malabar). As Royal Arcadia and its owners have, in fact, admitted  they "have custody of it."  *Id.* at 194.

[18] Further, the Supplemental Rider only purported to give Royal Arcadia the right to use the equipment at the restaurant for nine months.  Yet, George Varughese testified that he was entitled to use the equipment for the entire lease term.  George Tr. at 195.  Such inconsistent testimony demonstrates that Defendants will say anything to support their ever-changing story. One owner of Royal Arcadia, Thomas, testified his understanding was that Royal Arcadia purchased Malabar's equipment from Sang. Thomas Tr. at 28.

16

introduced himself to employees as a "partner" of Malabar.  Baljinder Tr. at 110-11.  Roy told

plaintiffs that he was an owner of the restaurant.  Kameena Tr. at 122; Avtar Tr. at 98.  Further, all of

the Defendants were introduced to Plaintiffs as owners of the restaurant.  Atul Tr. at 153; Manjit Tr.

at 60-61; Avtar Tr. at 93, 98, 101-03; Baljeet Tr. at 48; Baljinder Tr. at 52-54, 111.  Plaintiffs were

instructed to "take care of them well."  Manjit Tr. at 60-61.  A reasonable person would expect the

Defendants to have objected to being represented as an owner and being given benefits as owners.

Their failure to do so is admission by silence that they were owners of Malabar.[19]  Moreover, when

Plaintiffs complained that they had not been paid all of their wages, Defendants, if not owners, likely

would have raised some sort of disagreement about being brought the complaint, rather than advising

the Plaintiffs not to worry, they would be paid.[20]

     In addition, Defendants have demonstrated that they owned Malabar by their conduct during

the time the restaurant operated, including by:

- investing money into Malabar characterized as "loans" which entitled Defendants to a share of the restaurant's profits (Ex. Q.);

- never paying for their meals at the restaurant (Atul Tr. at 52-54; Avtar Tr. at 13; Carmo Tr. at 84-85, 88-89);

- failing to tip wait staff that served them (Atul Tr. at 31-32, 52-54);

- promising employees, including Plaintiffs, on various occasions that their wages and loans would be paid (Manjit Tr. at 50);

---

[19] The Advisory Committee Notes for Fed. R. Evid. 801(d)(2) state: "When silence is relied upon, the theory is that the person would, under the circumstances, protest the statement made in his presence, if untrue.  The decision in each case calls for an evaluation in terms of probable human behavior."  Rule 801(d)(2) generally calls for "generous treatment" in determining the admissibility of such putative admissions."  *Phipps v. Comprehensive Cmty. Dev. Corp.*, No. 00 Civ. 6063, 2005 WL 287413, at *13-14 (S.D.N.Y. Feb. 4, 2005) (party's failure to directly deny statement deemed an adoptive admission for the purpose of summary judgment motion).  "Ultimately any ambiguities and questions surrounding a party's actions and silences with regard to adoptive admissions should be for the jury to assess."  *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 259 (S.D.N.Y. 2003) (party may adopt another's statement by silence); *accord Amico v. County of Monroe*, No. 03-CV-6097, 2004 WL 2966950, at *7 (W.D.N.Y. Dec. 21, 2004) (same).

[20] *See Yuan ex rel. v. Rivera*, No. 96 Civ. 6628, 2000 WL 365036, at * 5 (S.D.N.Y. Apr. 7, 2000) ("having received a bill demanding payment for services [party] would reasonably have been expected to register disagreement").

- frequently giving employees instructions on how to prepare and present food (Atul Tr. at 29-31, 80-81; Kameena Tr. at 22-23, 58-59, 117, 119, 125, 173, 180);

- setting employees' pay rates and schedules (Avtar Tr. at 33-39);

- showing up to protect the restaurant's assets during an employee protest over wages (Atul Trs. at 41-42);

- discussing improving the business and what type of equipment to purchase for the restaurant with employees (Atul Tr. at 78-82);

- discussing aesthetic improvements being made at the restaurant to attract more business (Atul Tr. at 84-85);

- asking employees whether they were satisfied with their jobs and the salaries they were earning.  (Kameena Tr. at 19-20, 47, 52-53, 114, 118); and

- interviewing employees (Avtar Tr. at 30-33).

This evidence is sufficient for a jury to infer that Royal Arcadia and Malabar had substantially the same owners.  In addition, like *Flutie*, this conduct indicates that Royal Arcadia is controlled by the same individuals who controlled Malabar.  It is not disputed that Royal Arcadia performs essentially the same business and serves the same customers.  George Tr. at 200.  Royal Arcadia is simply a new hat for Malabar.

## C.    Malabar Incorporated Under the Name Royal Arcadia to Fraudulently Escape Its Obligations to Plaintiffs

The fraudulent conveyance exception involves the transfer of assets of one corporation to another for a fraudulent reason such as liability avoidance.  Direct evidence of fraudulent intent is rarely established.  *See, e.g.*, *People's Ins. Co. of China v. Indep. Radiator Sales, Inc.*, No. 97 CV 7935, 1999 WL 144521, at *5 (S.D.N.Y. Mar. 17, 1999).  Instead, courts infer fraudulent intent from "circumstances that so frequently accompany fraudulent transfers that their presence gives rise to an inference of intent," known as "badges of fraud."  *E.g.*, *id.* [21]

---

[21] The factors that are considered badges of fraud include:  "1) a close relationship among the parties to the transaction; 2) a secret and hasty transfer not in the usual course of business; 3) inadequacy of consideration; 4) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; 5) the use of dummies or fictitious parties or entities; and 6) retention of control of the property by the transferor after the conveyance."[21]

In light of the close relationship between the Defendants, Ali, and Sayed, the timing of Royal Arcadia's incorporation and taking of possession of the Restaurant and all of its equipment demonstrates that Royal Arcadia was incorporated (and Malabar was closed) to avoid its legal obligations to pay Plaintiffs' back wage and unpaid loans. By their own admission, Defendants are "shrewd business men" (George Tr. at 63) who obviously have no hesitation in manipulating the corporate form to avoid their obligations. Defendants have been close friend and business partners in a number of different ventures for nearly thirty years. Pltfs. 56.1 ¶¶ 205-251.

For several months prior to its incorporation and the shutdown of Malabar, Defendants negotiated their take over of the restaurant's lease under the name Royal Arcadia with the landlord for months. In July 2003, George negotiated with Sang to take over the restaurant under the name Royal Arcadia. Sang Tr. at 18; Thomas Tr. at 25-26. While George denies all knowledge regarding Ali and Sayed's flight, he told Thomas "There is a chance if you want, we can start a new business." Thomas Tr. at 26. In August 2003, an agreement was reached between the landlord and the Defendants. Royal Arcadia incorporated on August 3, 2003 and a few weeks later Malabar closed its doors on August 14 – the day of the New York City blackout. In response, Plaintiffs staged a protest outside of the restaurant. To deter some Plaintiffs from pursuing their claims, Defendants advised them on the day of the protest and on several occasions thereafter that they "would be paid." A. Kaur Tr. at 77. However, such payment was never made.

In this litigation, Defendants now disingenuously claim that they: (i) were only customers of Malabar, nothing more;[22] (ii) the Plaintiffs do not even "know them"; (iii) the money provided to George Varughese was not for Malabar, but were personal loans for Ali to purchase a home in

---

*Id.*; *see also In re Flutie N.Y. Corp.*, 310 B.R. at 59 (holding that "almost all of the badges are abundantly visible in this case"). Additionally, evidence of the intentional suppression of truth regarding business operations is indicative of fraudulent intent. *See People's Ins. Co.*, 1999 WL 144521, at *6. It is unnecessary to establish each badge of fraud to succeed on a fraudulent conveyance claim. *See id.*, at *6 (holding that plaintiff established the fraudulent conveyance exception by presenting evidence of three of the badges of fraud).

[22] Yet, the actions of the Defendants during the operation of Malabar go way beyond that of customers. *See* Section III *supra*.

India;[23] and (iv) (most importantly) Royal Arcadia is a different company than Malabar and the Defendants can not be held personally liable for any of Malabar's debts. Clearly, sufficient evidence exists for a jury to conclude that Royal Arcadia was formed for the sole purpose of avoiding the debt owed to Plaintiffs. Evidence of such a fraudulent transaction merits a denial of summary judgment for defendants. *See Baker v. Dorfman*, 2000 WL 1010285, at *6 (granting summary judgment in plaintiff's favor and holding defendant liable under the fraudulent conveyance theory of successor liability*); accord Pen Pak Corp. v. LaSalle Nat'l Bank of Chicago*, 658 N.Y.S.2d 407, 408 (App. Div. 1997) (denying defendant's motion for summary judgment on the ground that plaintiff raised issues of fact as to whether the transaction in question occurred fraudulently).

Finally, this is not the last time that Defendants attempted to manipulate the corporate form to overcome legal obstacles. Indeed, after Plaintiffs filed their Complaint, Defendants ceased doing business under the name Royal Arcadia and began operating under the name Namaskar, in a fraudulent conspiracy to obtain a liquor license. During its deposition Royal Arcadia admitted that it no longer operates under that name and uses the name Namaskar. Indeed, the sign in front of the restaurant and its menus have all been changed to Namaskar (T. Mathews Tr. at 81-82). Yet, Royal Arcadia denied having any affiliation with the company Namaskar NYC, Inc., which was incorporated at the Restaurant's address shortly after Royal Arcadia lost its liquor license. Kausik Tr. at 16. Plaintiffs deposed one of Royal Aradia's employees, Kausik Roy who, as they learned, is the CEO of Namaskar NYC, Inc. and negotiated a deal with Royal Arcadia to take over the restaurant in exchange for procuring a liquor license. Kausik Tr. at 13-14. Royal Arcadia even executed a sublease with Namaskar NYC two months before its deposition in which it denied that Royal Arcadia was operated as Namasakar NYC. Ex. T (Namaskar sublease). Given these suspicious set of

---

[23] This assertion is of course belied by the evidence in this case. Defendants have produced a chart summarizing all of the money they invested in Malabar, which they entitled "Loans to Malabar." Carmo Lobo admitted that the loan money he provided to George was to help Malabar. Carmo Tr. at 68. George told Lobo he "wanted money for Malabar. And he wanted to do the construction." Carmo Tr. at 69.

circumstances and Defendants repeated pattern of abuse of the corporate form, Royal Arcadia's fraudulent motivations are transparent.

**D.     A *De Facto* Merger Occurred Between Malabar and Royal Arcadia**

There is one final ground for establishing successor liability that falls outside the four traditional exceptions.  Many courts believe that the distinctions between exceptions two and three are so fine that "no criteria can be identified that distinguish them in any useful manner."  *Care Envt'l Corp. v. M2 Techs., Inc.*, No. 05 CV 1600, 2006 WL 148913, *11 (E.D.N.Y. Jan. 18, 2006). The doctrine of "de facto merger" arose as a combination of those two exceptions.[24]  A *de facto* merger occurs when "a transaction, although not in form a merger, is in substance 'a consolidation or merger of seller and purchaser.'"  *Nat'l Serv. Indus.,* 460 F.3d at 209.

There are four factors indicative of a *de facto* merger:  "(1) continuity of ownership; (2) cessation of ordinary business operations and the dissolution of the selling corporation as soon as possible after the transaction; (3) the buyer's assumption of liabilities ordinarily necessary for the uninterrupted continuation of the seller's business; and (4) continuity of management, personnel, physical location, assets and general business operation."  *M2 Tech.,* 2006 WL 148913, at *11; *Nat'l Serv. Indus.*, 460 F.3d at 209.  Plaintiffs are not required to establish every element of the *de facto* merger test.  *See M2 Tech.*, 2006 WL 148913, at *12 (finding the existence of successor liability despite lack of evidence of the third factor).  When Plaintiffs offer sufficient evidence of a *de facto* merger, courts do not hesitate to deny a defendant's motions for summary judgment on successor liability.[25]

---

[24]  The New York Court of Appeals has not expressly adopted this theory of successor liability; however, lower courts permit it.  *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 210 (2d Cir. 2006).

[25]  *See Beck v. Roper Whitney, Inc.*, 190 F. Supp. 2d 524, 538-39 (W.D.N.Y. 2001) (denying defendant's motion for summary judgment on the ground that a genuine question of material fact exists regarding plaintiff's allegation that defendant is liable under the de facto merger theory of liability); *accord Miller v. Forge Mench P'ship*, No. 00-Civ-4314, 2005 WL 267551, *6-14 (S.D.N.Y. Feb. 2, 2005) (granting plaintiff's motion for summary judgment and holding defendant liable under the de facto merger theory of successor liability*); Figueroa v. Coxline, Inc.*, No. 00-Civ-0327, 2001 WL 664560, *2-3 (S.D.N.Y. June 14, 2001) (denying defendant's motion

The facts of this case establish that a *de facto* merger occurred between unincorporated Malabar and Royal Arcadia.  As described above, there is a substantial  continuity of ownership between Malabar and Royal Arcadia because George, Raju, Thomas, Roy, and Carmo owned both entities.  There is no dispute between the parties that Malabar ceased its business operations and dissolved soon after Royal Arcadia came into existence.  Royal Arcadia assumed Malabar's liabilities, namely the lease arrears, "ordinarily necessary for the uninterrupted continuation" of the business.  Finally, Royal Arcadia has a continuity of management, personnel, physical location, assets and general business operation of Malabar.  Roy managed both restaurants (Kausik Tr. at 61; Avtar Tr. at 13, 98, 102-03; Baljinder Tr. at 52-54; Atul Tr. at 52-54; Roy Tr. at 95, 98), several employees worked at both restaurants (Def. Br. At 16), the restaurants are in the same physical location (Def. 56.1 at ¶ 84), use substantially the same equipment (Sang Tr. at 41-47), have the same business operations, the service of the same Indian cuisine (Manjit Tr. at 118; Carmo Tr. at 109), and serve the same customers (George Tr. at 200).

### E.  Standard for Successors Liability Advanced by Defendants Demonstrates Royal Arcadia Is Liable

Acknowledging that New York federal courts have not explicitly set forth a test for successor liability under the FLSA, Defendants have argued that this Court should adopt a nine-factor test, which has been applied in the employment discrimination context, to determine whether imposing liability on a successor in this case is appropriate.[26]  Def. Br. at 15.  If adopted by this Court, the test advanced by the Defendants is limited to Plaintiffs' FLSA claims, and does not apply to Plaintiffs'

---

for summary judgment and holding that "[t]here is . . . a dispute regarding whether the transaction at issue . . . was a *de facto* merger . . .") (internal citations omitted); *Sweatland v. Park Corp.*, 587 N.Y.S.2d 54, 55-56 (App. Div. 1992) (denying defendant's motion for summary judgment and holding that plaintiff raised genuine issues of material fact of defendant's liability under the de facto merger theory of successor liability).

[26] Those nine factors are as follows: (1) whether the successor employer had notice of the complaint; (2) the predecessor's ability to provide relief; (3) whether there had been substantial continuity of business operations; (4) whether the successor uses the same facility; (5) whether the successor uses the same workforce; (6) whether the successor use the same or substantially the same supervisory personnel; (7) whether the same jobs exist under substantially the same working conditions; (8) whether the successor uses the same machinery equipment and methods of production; and (9) whether the successor produces the same product.  *See Abdel-Khalek v. Ernst & Young LLP*, No. 97 Civ. 4514, 1999 U.S. Dist. LEXIS 2369, at *19 (S.D.N.Y. Mar. 5, 1999).

22

New York law claims, which must be decided under the aforementioned theories of successor liability that have been applied by New York state and federal courts.

Even under the nine-factor test urged by the Defendants, it is clear that Royal Arcadia is a successor to Malabar.  Regarding the first factor, Royal Arcadia and its owners were aware of Plaintiffs' claims since its inception on August 5, 2003.  Prior to August 5, 2003, Royal Arcadia's owners had been advised by Plaintiffs of their unpaid wages and loans.  Avtar Tr. at 72, 77.  After Royal Arcadia's incorporation, on August 14, Royal Arcadia was again made aware of Plaintiffs' claims by their protest outside of the Restaurant.  Baljinder Tr. at 84-85.  Royal Arcadia was again put on notice of Plaintiffs claims by news paper reporter who interviewed them regarding Plaintiffs' unpaid wages and loans.  *See* Ex. X ("Malabar Investors Confront Group Outside of Catering Hall").[27]  Thus, it is clear that on numerous occasions Royal Arcadia was put on notice of Plaintiffs' claims.  Defendants' contention that Royal Arcadia did not have notice of the Complaint until it was served (Def. Br. at 16), is disingenuous at best.

Regarding the second factor, both Plaintiffs and Defendants recognize that Malabar ceased operating in August 2003 when Sayed and Ali fled the country, and that as a result Malabar is not capable of providing relief to Plaintiffs.  Conceding that relief from Malabar, or two of its owners (Ali and Sayed) is impossible, Defendants have abandoned all effort to recover the monies they invested into the Restaurant. Longi Tr. at 98-99; Raju Tr. at 19.  Contrary to Defendants' unsupported assertion (Def. Br. at 16), Plaintiffs have made every effort possible to locate Ali and Sayed in an effort to recovery their unpaid wages and loans, including by filing a complaint against them with the District Attorney's office and filing this lawsuit, which gave them the ability to depose the Defendants to inquire about Ali and Sayed's whereabouts.  Despite Plaintiffs' best efforts, however, they have been unable to recover their lost wages and loans.

---

[27]  This article was published within a week of the August 14, 2003 black out in New York city.

23

Regarding the third factor − which is not even discussed by Defendants, − there is a substantial continuity in the business operations between Malabar and Royal Arcadia. As described above, the Restaurant only shutdown briefly for a period of three months, then reopened serving essentially the same food with the same recipes to the same customers under the same manager (Roy Mathew). *See* Section VI(D) *supra*.

Regarding the fourth factor, there is no question that Malabar and Royal Arcadia use the same facility located at 206-12 Hillside Avenue. Ex. U (Malabar lease arrears stmt.); Ex. R (Royal Arcadia lease). While Defendants claim in their brief that "the tables in Royal Arcadia are different than those at Malabar" (Def. Br. at 16), Royal Arcadia's 30(b)(6) testified that Royal Arcadia used some of the same tables, chairs, pots, silverware, and speakers. George Tr. at 340-41.

Regarding the fifth factor, Royal Arcadia concedes that three individuals worked at Malabar and also Royal Arcadia, including one of the Plaintiffs (Manjit). Thus, a portion of the same workforce, shared by the two entities, is met. Def. Br. at 16.

Regarding the sixth factor, Defendants concede that Raju, George, and Roy were supervisors at Royal Arcadia. Def. Br. at 17. As explained in Section III, *supra*, these individuals were also supervisors at Malabar.

Regarding factors seven and eight, Defendants, as they must, admit that the duties of Royal Arcadia and Malabar employees are the same and that the restaurants both use the same types of machinery. Def. Br. at 17.

Finally, regarding the ninth factor − ignored by the Defendants − Malabar and Royal Arcadia produce the same product, Indian food. Thus, these factors weigh overwhelmingly in favor of finding successor liability.

## VII.   UNINCORPORATED MALABAR (NOW KNOWN AS ROYAL ARCADIA) AND ITS OWNERS DEFRAUDED PLAINTIFFS THROUGH MALABAR'S AGENTS ALI KUTTY AND SAYED HUSSAIN

### A.   Plaintiffs Have Been Defrauded by Defendants

Defendants do not genuinely offer any dispute that as agents of Malabar Ali and Sayed defrauded Plaintiffs.[28]  Defendants' unsupported allegation that "there is no evidence that Sayed made any misrepresentation about the purpose for the loans, i.e., for rent of capital improvements for Malabar" is demonstrably false.  Def. Br. at 20.  Defendants told Baljinder Kaur that her money would be used to renovate and improve the restaurant, which never occurred. [29]  Baljinder Tr. at 93.  Defendants told Baljinder Kaur and Manjit Singh that the money they loaned the defendants would be used to expand the business to include dinner party services, which never occurred.  Baljinder Tr. at 92, 126; Manjit Tr. at 46.  Defendants also told Baljinder Kaur and Avtar Kaur that some of their money would be used to pay a final month's rent.  Avtar Tr. at 91-82, 86, 88, 99; Baljinder Tr. at 92, 124.  Sayed and Ali never used the Plaintiffs' money to make rental payments, leaving Malabar in arrears.  Ex. U (statement showing arrears).  Relying on these representations, it is undisputed that Plaintiffs loaned $36,000 to Malabar.[30]  Sayed and Ali also falsely told these Plaintiffs on numerous

---

[28]  To maintain a common law claim for fraud, a plaintiff must prove: "(1) a misrepresentation of a material fact; (2) falsity of that representation; (3) scienter; (4) reasonable reliance on the representation; and (5) damages." *United States v. Rivieccio*, 846 F. Supp. 1079, 1083 (E.D.N.Y. 1994) (defendant's fraudulent acquisition of funds from credit union and its members to purchase and develop numerous real properties constituted fraud); *accord Talansky v. Schulman*, 770 N.Y.S.2d 48, 53 (App. Div. 2003) (summary judgment denied where plaintiff loaned defendant $300,000 based on defendant's statements about safety, low risk, profitability and security of the loan). Additionally, "a cause of action for fraud may be maintained where a plaintiff pleads a breach of duty separate from, or in addition to, a breach of contract . . . [f]or example, if a plaintiff alleges that [he or she] was induced to enter into a transaction because a defendant misrepresented material facts [about loans], the plaintiff has stated a claim for fraud even though the same circumstances give rise to the plaintiff's breach of contract claim."  *First Bank of Americas v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 20 (App. Div. 1999).

[29]  Defendants argue that their loan/investments in the restaurant are the same as the employee loans made by Plaintiffs, however, Sayed made it clear to the Plaintiffs that they were different.  Sayed advised that the amount loaned by the Plaintiffs to Malabar was not enough to make them partners in the business (Manjit Tr. at 62), whereas the Defendants invested significantly more in the restaurant were treated like partners, acted like partners, and told Plaintiffs that they were partners with Ali and Sayed in the restaurant.

[30]  Def. 56.1 at 4, ¶21 (Avtar - $10,000); Def. 56.1 at 6, ¶40 (B. Kaur - $6,000); Def. 56.1 at 8, ¶65 (Manjit - $20,000).

occasions that their loans and back wages would be repaid.  Defendants even admit that Sayed and Ali were "crooks" and "not honest people."  Carmo Tr. at 16.

To conclude their fraudulent scheme and escape liability, Defendants began negotiating a new lease with the landlord for the restaurant, Albert Sang in July 2003, weeks before Ali and Sayed would flee and Malabar was closed.  Sang Tr. at 18; Thomas Tr. at 25-26.  Defendants convinced Sang to lease the restaurant to them under a different name in exchange for their satisfaction of Malabar's lease arrears.  Sang Tr. at 22-24.  The Defendants attempted to hide this payment by executing a Supplemental Rider to the lease with Mr. Sang that on its face provided that the Defendants were paying to license the restaurant's equipment, which they owned, from Mr. Sang.  Sang Tr. at 27-29.  Defendants even now admit that the $45,000 payment in the Supplement Rider was not for the use of equipment located at the Restaurant. Def. 56.1 at 11, ¶ 88.

The proposed expansion and significant changes to the Restaurant never occurred while the Restaurant was under the name Malabar.  Atul Decl. ¶ 9.  In August 2003, Malabar closed and Defendants promised Plaintiffs that their unpaid wages and loans would be paid.  Avtar Tr. at 77.  Subsequently, Defendants took possession of the Restaurant under the name Royal Arcadia and made renovations and improvements to the Restaurant between September and December 2003.  Since reopening the Restaurant under the name Royal Arcadia (now known as Namaskar) they have denied all liability to Plaintiffs.

**B.      Defendants Are Liable For Fraud as Owners of the Unincorporated Entity Malabar and/or Because of Their Partnership with Ali and Sayed**

Defendants misunderstand Plaintiffs' agency theory to contend that because Sayed and Ali were not agents of the Defendants cloaked with either actual or apparent authority, the Defendants cannot be bound by their actions.  Def. Br. at 19.  Significantly, they do not deny that Ali and Sayed had actual authority to bind Malabar.  Indeed, under Defendants' theory of the case Ali and Sayed were owners and managers of Malabar capable of making all decisions on behalf of the company,

26

including hiring, firing, setting work schedules, and setting pay.  Def. 56.1 at ¶¶ 1-7.  As agents of

Malabar, these individuals were capable of binding that unincorporated entity.  Therefore, the

unincorporated entity Malabar is responsible for the debts owed to Plaintiff.

As explained above, all of the defendants have admitted they were owners of Malabar when

it was in operation, either by their words or their conduct.  *See supra* Section III.  On December 29,

1999, prior to the accrual of Plaintiffs' claims in this matter, Malabar lost its status as an incorporated

entity.  *See* Ex. V (Letter from Secretary of State).  It is black letter New York law that owners of an

unincorporated entity may be held liable personally liable for the debts their business incurs.[31]  For

example, sole proprietors, who operate businesses outside the realm of the corporate, partnership, or

limited liability corporate forms are individually liable for business debts.[32]  In fact, "[d]oing

business under another name does not create an entity distinct from the person operating the

business."  *See id*. at 258.  Because the owners and investors of the entity that operated the

Restaurant after the corporation Malabar dissolved did not protect themselves from liability by

incorporating (*see* Ex. Q (certificate of dissolution), those owners are personally liable for all debts of

the Restaurant, most notably plaintiffs' claims for fraud, and unpaid wages and loans.

Defendants may also be held liable for the debts of Malabar based on their business

partnership with Sayed and Ali, two of its undisputed owners. Def. 56.1 at 2, ¶1.  In New York, "a

partnership is an association of two or more persons to carry on as co-owners a business for profit."

N.Y. P'SHIP LAW, § 10(1) (McKinney 2007).  To establish the existence of a partnership, a plaintiff

must prove "(1) the parties' sharing of profits and losses; (2) the parties' joint control and

management of the business; (3) the contribution by each party of property, financial resources,

---

[31] New York courts have long held that all members of an unincorporated association for profit may be held liable for the debts of the entity.  *See United Press v. A.S. Abell Co*., 84 N.Y.S. 425, 425 (App. Div. 1903) (holding that because one member bound the association to a certain obligation all members are liable for that obligation).  One member of the association can, through his actions, bind all members of the association.  *See id*.

[32] *See Trustees of the Mason Tenders, Dist.. Council Welfare Fund v. Faulkner*, 484 F. Supp. 2d 254, 257-58 (S.D.N.Y. 2007) ("The individual who does business as a sole proprietor . . . remains . . . personally liable for all his obligations.").

effort, skill, or knowledge to the business; and (4) the parties' intention to be partners." *See Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004). "The requirement that the parties have agreed to share in the profits and losses is 'an indispensable essential of a contract of partnership . . . .'" *Id*. (declining to establish a partnership on the grounds that plaintiff "failed to demonstrate . . . that the parties had an agreement to share profits and losses").

Here, the elements of partnership have been established. Defendants invested more than $500,000 in the Malabar. *See* Ex. Q (chart showing loans to Malabar). Defendants' understanding was that they would share in the profits, and only be repaid the loans if Malabar was profitable. Thomas Tr. at 14-15, 22-23, 31, 72; Thomas Depo. Ex. 1. In fact, on occasions when Defendants' inquired of Sayed and Ali regarding payments on the loans they made to Malabar, they were told (and accepted) that since Malabar was not making money they could not be paid back. Also, based on the instructions provided by the Defendants to Plaintiffs, it is clear that the Defendants had joint control and management of the Restaurant with Ali and Sayed. The more than half million dollars contributed by Defendants qualifies as a significant contribution. Finally, Defendants demonstrated their intent to be partners with Ali and Sayed by their words and conduct. *See* Section VI. B. *supra*.

Alternatively, individuals may be held personally liable as partners under the theory of partnership by estoppel. An individual is estopped from denying personal, partnership style liability if:

> [the] person by words . . . represents himself, or consents to another representing him to any one, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership.

N.Y. P'SHIP LAW, § 27(1) (McKinney 2007). The focus of this theory of liability is not the formal arrangement between the alleged partners. Instead, courts focus on (i) whether any

28

representation regarding the status of an individual was made to the plaintiff, and (ii) whether the plaintiff acted in reliance that representation.[33]

Again, the Defendants represented themselves as partners in the Restaurant and/or allowed themselves to be represented as such.[34]  *See* Section VI. B., *supra*.  These facts alone justify denying Defendants' motion to dismiss Plaintiffs' claims, and merit a trial.  *See, e.g.*, *Sitchenko v. DiResta*, 512 F. Supp. 758, 761 (E.D.N.Y. 1981) (denying defendant's motion to dismiss plaintiff's partnership by estoppel claim and noting that "at least one individual defendant held himself out, and the others apparently allowed themselves to be held out, as partners in the Partnership with which [plaintiff] contracted).

Plaintiffs also relied on representations that the Defendants were partners.  Reliance on the representation of the existence of a partnership is established by demonstrating that the plaintiff gave "credit" to the alleged partnership.  *See Four Star*, 1997 U.S. Dist. LEXIS 14519, at *37.  This element is met by showing that the plaintiff extended financial credit to the alleged partnership.  *See id*. (summarizing interpretations of N.Y. P'ship Law § 27(1)).  The loans extended by Plaintiffs to Malabar demonstrate their reliance on the existence of a partnership between Sayed, Ali, and the Defendants.  Moreover, Plaintiffs gave credit to the alleged partnership by performing their hired positions.  *See Sitchenko*, 512 F. Supp. at 761-63 (permitting plaintiff's breach of contract claim against individuals under the theory of partnership by estoppel).  Accordingly, Defendants' motion for summary judgment regarding Plaintiffs' fraud claim should be denied.

---

[33]  *See Four Star Capital Corp. v. NYNEX Corp.*, No. 93-8974, 1997 U.S. Dist. LEXIS 14519, *37-40 (S.D.N.Y. Sept. 25, 1997) (denying defendant's motion to dismiss and holding that plaintiff presented sufficient evidence of representation and reliance).

[34]  Indeed, Defendants are partners in multiple business.  *See supra*, n. 22.

500138236v7

C.    **Plaintiffs' Fraud Claims Stemming from Defendants Failure to Repay Their Loans Should Not Be Dismissed As Duplicative of Their FLSA claims**

Defendants argue that "FLSA claims cannot be recast as duplicative common law claims." Def. Br. at 20.  The law as to whether the FLSA preempts state law fraud or breach of contract claims is unsettled in the Second Circuit.  *See Chen v. Street Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 277 (E.D.N.Y. 2005).  Other Circuits confronted with the FLSA preemption issue held have found that if the common law claims are grounded on different facts than the FLSA claims, then those claims are not preempted by the FLSA.[35]  Unlike *Street Beat* (relied upon by the Defendants),[36] the Plaintiffs' common law fraud claims are founded on the non-repayment of their loans, not minimum wage and overtime payments.  Plaintiffs' facts are not duplicative of their minimum wage and overtime payment claims.  The Plaintiffs rightfully claimed minimum wage and overtime payments, to which they are entitled under FLSA, in addition to common law fraud.  Therefore, Plaintiffs' fraud claims are not duplicative of their FLSA claims and are not preempted by the FLSA.

VIII.    **MALABAR (NOW KNOWN AS ROYAL ARCADIA) AND ITS OWNERS BREACHED THEIR CONTRACTS TO REPAY PLAINTIFFS' BACK WAGES AND LOANS**

A.    **FLSA Does Not Preempt Plaintiffs' Claims for Back Wages and Unpaid Loans**

To the extent that the FLSA is inapplicable to Plaintiffs' claims as the Defendants assert (*see* Def. Br. at 3), the FLSA does not preempt Plaintiffs' claims for back wages.  For preemption, the FLSA must provide a remedy for Plaintiffs' claims.  *See Petras v. Johnson*, No. 92-Civ-8298, 1993 U.S. Dist. LEXIS 8464, *2 (S.D.N.Y. June 16, 1993) (holding that state common law claims for which there is a remedy available under the FLSA are barred by the FLSA).  Whether the FLSA does

---

[35]    *See, e.g.*, *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir. 2000) (holding plaintiffs' common law fraud claims, based on their employer's misrepresentations, were not preempted by FLSA).

[36]    Defendants also rely on *Petras v. Johnson*, No. 92-8298, slip op. at 2 (S.D.N.Y. June 22, 1993), however, in the instant case, unlike the plaintiff in *Petras*, the Plaintiffs' fraud claims are grounded on facts that deal with employee loan repayment, not their entitlement to overtime payments and minimum wages.  Additionally, the claims are based on misrepresentations of an intent to repay the employee loans.  FLSA provides no remedy for Defendants' wanton, willful and malicious conduct.

in fact provide a remedy for the Plaintiffs claims in this case is a factual determination incapable of resolution on summary judgment.  *See* Section II *supra*.

Regarding Plaintiffs' claims for their unpaid loans, FLSA does not preempt state law breach of contract claims that are not grounded on the same facts as FLSA claims.[37]  Additionally, "FLSA does not create the exclusive remedy for unpaid wages, nor does the FLSA preempt a state law claim compensable pursuant to a contract but not the FLSA." *Id*.; *see also Avery*, 24 F.3d at 1348 (explaining that FLSA is not the only remedy for unpaid wages and that FLSA does not preempt a state law contract claim that is not compensable under FLSA).  In *Hammond*, the plaintiffs brought claims against the defendant employer for breach of an employment contract to pay the employees for all hours worked.  *Id*. at 977.  The Court held that if the plaintiffs had certain rights outlined in the employment contract, the plaintiffs could recover under their state law breach of contract claims and FLSA did not preempt these rights available at common law.  *Id*. at 979.

Defendants cite no cases to support the proposition that FLSA preempts state law breach of contract claims.  In the instant case, Plaintiffs relied on Defendants' promise to repay their loans. Plaintiffs' facts for their state law breach of contract claims are grounded on the employee loan transactions that took place between Husseim and the Plaintiffs in the presence of witnesses, not overtime or minimum wage violations.  Because the Plaintiffs' common law breach of contract claims are not grounded on the same facts as the Plaintiffs' FLSA claims (to the extent that FLSA covers all of Plaintiffs' claims), Plaintiffs' breach of contract claims are not duplicative of their FLSA claims.

---

[37] *Avery v. City of Talladega, Ala*. 24 F.3d 1337, 1348 (11th Cir. 1994) (explaining FLSA does not preempt a state law breach of contract claim compensable pursuant to a contract but not the FLSA); *Hammond v. Lowe's Home Ctrs., Inc.*, 316 F. Supp. 2d 975, 979 (D. Kan. 2004) (holding plaintiffs' common law breach of contract claims, based on employment contracts, were not preempted by FLSA).

### B.    Plaintiffs' Claims for Unpaid Loans Do Not Violate the Statute of Frauds

Defendants' argument that Plaintiffs' claims for unpaid loans violates the Statute of Frauds has absolutely no factual or legal basis.  Def. Br. at 22.  At the time the loans were made to Malabar, Plaintiffs were promised that they would be repaid within six months.  Manjit Tr. at 51.[38]  Such oral agreement capable of being performed within one year do not violate the New York Statute of Frauds.  *See* N.Y. Gen. Oblig. Law §5-701(a)(1) (McKinney's 2007).

### C.    Plaintiffs' Contracts for the Repayment of Their Back Wages and Loans Have Been Breached

Defendants do not deny that Malabar failed to pay Plaintiffs all their wages owed and failed to repay loans provided by Plaintiffs to Malabar.[39]  In fact, Plaintiffs are entitled to partial summary judgment regarding their unpaid wages and loans.  Essentially, the Defendants do not dispute (and have no admissible evidence to contradict) that Plaintiffs are owed the amounts claimed in unpaid wages and loans by Malabar.  They only dispute that they should be responsible for paying these amounts.  Numerous factual issues are in dispute that are necessary to determine whether Defendants may be held responsible as: (i) Plaintiffs' employers under the FLSA or New York law; (ii) owners of the unincorporated entity Malabar; or (iii) successors because Royal Arcadia is a successor to Malabar, which is incapable of using its corporate shield to protect its owners from personal liability.

---

[38] Defendants attempt to simultaneously claim on one hand that Plaintiffs have no admissible evidence that the repayment of the loans was to be complete within one year, while arguing that the statements made by Ali and Sayed that these loans were to be repaid within one year are inadmissible on the other hand.  Def. Br. at 22.  Such an assertion is wrong.  First, these statement are not hearsay since they demonstrate that Plaintiffs were put on notice that the loans would be repaid in less than one year.  Second, even if hearsay, these statements are admissible because they are admissions of opponents, Sayed and Ali, and statements against their interests.

[39] Plaintiffs worked for Malabar for the period of time they alleged.  Def. 56.1 at 3, ¶14 (Avtar); Def. 56.1 at 5, ¶35 (B. Kaur); Def. 56.1 at 6, ¶47 (Kameena); Def. 56.1 at 8, ¶59 (Manjit); Def. 56.1 at 9, ¶71 (Atul).  Plaintiffs "complained to Ali and Sayed that they were not being paid their wages."  Def. 56.1 at 2, ¶8; Def. 56.1 at 4, ¶20; Def. 56.1 at 5, ¶30.  Plaintiffs made loans to Malabar. Def. 56.1 at 4, ¶21 (Avtar - $10,000); Def. 56.1 at 6, ¶40 (B. Kaur - $6,000); Def. 56.1 at 8, ¶65 (Manjit - $20,000).

IX.   **PLAINTIFFS' ALTERNATIVE EQUITABLE CAUSES OF ACTION FOR UNJUST ENRICHMENT AND *QUANTUM MERUIT* ARE MERITORIOUS**

A.   **Plaintiffs Assert Their Claims For Equitable Relief In The Alternative**

In their Complaint, Plaintiffs assert that Defendants must pay for the reasonable value of the services they provided under the theory of *quantum meruit*, and that the loan amounts should be returned to them because Defendants (as owners of Malabar) have been unjustly enriched by Malabar retaining these monies.  Defendants contend that both of these equitable remedies should be denied because adequate remedies at law exist through the FLSA and the breach of contract claim.  However, this Court need not make this determination because Plaintiffs only rely on the equitable claims if the remedies at law fail.  *See* Compl. at ¶¶ 97, 102.[40]

B.   **Plaintiffs' Claims for Equitable Relief Should Not Be Dismissed Out of Hand**

Defendants further argue that the *quantum meruit* claim should fail because they were not Plaintiffs' employers (an issue Plaintiffs vigorously dispute) and the unjust enrichment claim should fail because the loans were not made directly to Defendants.  However, it is irrelevant that Defendants were not the employers of Plaintiffs for the *quantum meruit* claim to survive.  Plaintiffs were employees of Malabar.  As the successor corporation to Malabar, Royal Arcadia is responsible for compensating Plaintiffs.  *See* Section VI *supra.*  The individual Defendants may also be held personally liable for the debts of Malabar Palace as its former owners and/or owner of the its successor company.  *See* Section VII(b) *supra.*  Similarly, it makes no difference that Plaintiffs did not make the loans directly to Defendants.  The loans were made to Malabar, which was unjustly enriched because it did not repay these debts.

C.   **Plaintiffs Should Prevail On Their Alternative Claims For Equitable Relief**

Plaintiffs have alleged sufficient facts to prevail on both of their alternative equitable claims.  To prevail on a claim of unjust enrichment, a plaintiff must establish that:  (1) the defendant was

---

[40] Plaintiffs plead the *quantum meruit* and unjust enrichment claims in the alternative should they be deprived of their claims under the FLSA or for breach of contract for some unforeseen reason.  *Id.*

enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances are such that equity and good conscience require restitution.[41]  In determining the third element, courts will evaluate several factors: whether a benefit has been conferred on the defendant under mistake of fact or law; if the benefit still remains with the defendant; if there has been otherwise a change of position by the defendant; and whether the defendant's conduct was tortious or fraudulent.  *Id.* at 421.  No single factor controls this determination, rather, courts should assess the totality of circumstances.  *Id.*

In the instant case, Malabar clearly received a benefit at the expense of Plaintiffs in the form of the loan monies.  Although Plaintiffs believed the promise that their loans would be repaid, the $36,000 was fraudulently retained by Ali and Syed.  Equity and good conscience require that Defendants return the loan monies to Plaintiffs.

To establish a claim for *quantum meruit* under New York law, a plaintiff must show: (1) the performance of services in good faith; (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation therefore; and (4) the reasonable value of the services.  *Bongat*, 341 F. Supp. 2d at 188.  The rendering and acceptance of services creates a presumption that such services were to be compensated, "because no one is expected to labor without hire."  *Fox v. Arctic Placer Mining & Milling Co.* 229 N.Y. 124, 128 (1920).

Plaintiffs must be compensated by Defendants for their work under the theory of *quantum meruit*.  Each of the Plaintiffs provided services in the form of their labor to Malabar.  They were promised and expected certain wages for their services that remain unpaid.  Defendants have not, and cannot, dispute the amounts of unpaid wages and loans.  *See* Section VIII *supra.*

---

[41] *Bongat v. Fairview Nursing Care Ctr. Inc.*, 341 F. Supp. 2d 181,188 (E.D.N.Y. 2004).  *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir. 2001). The vital inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered. *Paramount Film Distrib. Corp. v State of New York*, 30 N.Y.2d 415, 421 (1972).

500138236v7

## <u>CONCLUSION</u>

Based on the foregoing, Defendants' motion for summary judgment should be denied in its entirety, and Plaintiffs should be awarded partial summary judgment on their claims for unpaid wages and loans.

Dated:  New York, New York
        July 20, 2007

By:     /s/ Kenneth A.Newby

PILLSBURY WINTHROP SHAW PITTMAN LLP
Sangita A. Shah (SS7815)
Kenneth A. Newby (KN0546)
Eric Fishman (*of counsel*)
1540 Broadway
New York, NY  10036
(212) 858-1000

ASIAN AMERICAN LEGAL DEFENSE AND
EDUCATION FUND
Kenneth Kimerling (KK5762)
Tushar J. Sheth (TS5672)
99 Hudson Street
New York, NY  10013
(212) 966-6030

*Attorneys for Plaintiffs*

500138236v7