UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

BALJINDER KAUR, ATUL KAMATH, AVTAR
KAUR, BALJEET KAUR, VIMLA PATEL, VINITA
ARORA, MANJIT SINGH, and KAMEENA
BAMBAM,

               Plaintiffs,

     -against-

ROYAL ARCADIA PALACE, INC., and GEORGE
RAJU VARGHESE, GEORGE VARGHESE, ROY
MATHEWS, THOMAS MATHEWS, CARMO
LOBO, and TARIQ LONGI, d/b/a MALABAR
PALACE,

               Defendants.

-----------------------------------------------------------------X

**MEMORANDUM & ORDER**

05-CV-4725 (NGG) (JO)

GARAUFIS, District Judge.

    Plaintiffs Baljinder Kaur ("Baljinder"), Atul Kamath ("Atul"), Avtar Kaur ("Avtar"),

Baljeet Kaur ("Baljeet"), Vimla Patel ("Vimla"), Manjit Singh ("Manjit"), and Kameena

Bambam ("Bambam")[1] were employees of Malabar Palace ("Malabar"), an Indian restaurant in

Queens. Malabar closed in August 2003, when Plaintiffs were owed significant amounts of

money in back-pay, over-time pay, and repayment on various loans, and two of their bosses,

Sayed Hussein ("Sayed") and Mohammad Ali Kutty ("Ali"), fled the jurisdiction. Shortly

thereafter, another Indian restaurant, Defendant Royal Arcadia Palace ("Royal Arcadia") opened

in the same location.

---

[1] Plaintiff Vinita Arora was dismissed as a plaintiff by this court. (See Order dated Nov.
30, 2007 (Docket Entry #108).)

1

Plaintiffs allege that Royal Arcadia is a successor to Malabar and was created to avoid Malabar's debts. They bring suit against Royal Arcadia and its owners, Defendants George Raju Varghese ("Raju"), George Varghese ("George"), Roy Mathews ("Roy"), Thomas Mathews ("Thomas"), Carmo Lobo ("Carmo"), and Tariq Longi ("Tariq"), claiming that: 1) Defendants, through their agents Sayed and Ali, committed fraud by promising, and failing, to repay Plaintiffs' loans and pay Plaintiffs' back-pay; 2) Defendants violated the minimum-wage provision of the Fair Labor Standards Act ("FLSA"); 3) Defendants violated the FLSA overtime-wages provision; 4) Defendants violated New York Labor Law ("NYLL") by failing to pay wages on a weekly basis; 5) Defendants failed to comply with NYLL's minimum wages provision; 6) Defendants violated NYLL's overtime-wages provision; 7) Defendants failed to comply with NYLL by not compensating Plaintiffs with one additional hour of pay for any workday of more than ten hours; 8) Defendants, through their agents Sayed and Ali, breached their contract with Plaintiffs to repay Plaintiffs' loans; 9) Defendants, through their agents Sayed and Ali, breached their contract with Plaintiffs to pay Plaintiffs' salaries; 10) Defendants were unjustly enriched by failing to repay Plaintiffs' money; and, 11) Defendants received the benefits of Plaintiffs' labor without compensation.

Before the court is a motion for summary judgment brought by Defendants Royal Arcadia, Raju, George, Roy, Thomas, and Carmo ("Defendants").[2] They claim that: 1) Plaintiffs' FLSA claims must fail because (a) Malabar is not covered under the FLSA, (b) Defendants were not Plaintiffs' employers, and (c) the statute of limitations was violated; 2) Plaintiffs' claims are barred by the defense of laches; 3) Royal Arcadia is not a successor to

---

[2] Tariq did not join in Defendants' motion for summary judgment.

Malabar and therefore is not liable for Malabar's debts; 4) Sayed and Ali were not Defendants' agents, and therefore Defendants are not liable for Sayed and Ali's contracts or fraudulent statements; 5) Plaintiffs' breach-of-contract claims must be dismissed because the contracts violated the statute of frauds; and, 6) Defendants were not unjustly enriched. For the reasons outlined below, Defendants' motion is GRANTED in part and DENIED in part.

## I.    Factual Background

### *Malabar*

At the time of the allegations giving rise to the Complaint, Ali and Sayed were owners of Malabar. (Baljeet Dep. at 26-28; Kameena Dep. at 29-30, 52-53; Manjit Dep. at 60-61; Tariq Dep. at 12, 79.) Plaintiffs claim that Defendants Raju, George, Roy, Thomas, Tariq, and Carmo were also owners of Malabar. (Atul Dep. at 52, 153; Avtar Dep. at 93, 98, 102-03; Baljinder Dep. at 52-54, 111; Manjit Dep. at 60-61, 63; Kameena Dep. at 52-53; Baljeet Dep. at 26, 47-48; Vimla Dep. at 26.) Malabar's premises were owned by YM Sang Realty, and Albert Sang ("Albert") was the vice president of that company. (Raju Aff. ¶ 13; Albert Dep. at 8.)

### *Plaintiffs*

### *Plaintiff Avtar*

Avtar worked making bread at Malabar from March or April 2002 until August 2003. (Avtar Dep. at 20-21, 41.) She received the job after meeting with Ali, Sayed, Tariq, and Defendant Roy in their office at Malabar. At the time she was hired, Ali told Kaur that the restaurant was expanding and that Avtar should refer any other prospective employees to him. (Id. at 30-31.) Ali and Tariq then told Avtar the day on which she should begin working, and they explained the terms of her employment. (Id. at 33-34.) In June 2003, Ali, Sayed, and Tariq

3

told the employees that they had a "last payment" to make on the Malabar building and they "didn't have the money." They asked Avtar to "help them out so they could give their last payment for the building," and Avtar gave them $10,000. (Id. at 13, 80-82.) According to Plaintiffs, the rental payments were never made and Sayed and Ali disappeared. (Id. at 80-82; Albert Dep. at 22-23.)

*Plaintiff Manjit*

Manjit began working in the kitchen of Malabar in September 2001. (Manjit Dep. at 33-34.) He had previously sold newspapers to Sayed, and one day, Sayed asked Manjit to work for him at Malabar. (Id. at 34.) Thereafter, Manjit met with Ali and Sayed for an interview, during which they told Manjit the terms of his employment. (Id. at 35-37, 42.) Ali and Sayed said that the first two weeks would be a trial period, and which he could work at Malabar permanently. (Id. at 37, 42.) Sayed supervised him, and sometimes Ali would give him instructions as well. (Id. at 56, 60.) Both Ali and Sayed paid Manjit. (Id. at 42.)

On one occasion, Ali and Sayed went to Manjit's house and told him that they needed money to expand Malabar. They said that if Manjit gave them money, he would receive a share of Malabar's profit and would be repaid within six months. Manjit gave them $20,000. (Id. at 46-48, 51.)

Manjit worked at Royal Arcadia for three weeks in the summer of 2004. (Id. at 66-68.)

*Plaintiff Baljeet*

Baljeet, Plainitff Manjit's wife, worked at Malabar from 2002 until August 2003 making bread, washing the dishes, and cleaning the kitchen. (Baljeet Dep. at 14, 25.) Sayed hired her and told her that she would work twelve hours per day and would be paid $300 per week. (Id. at

4

17-20.) Sayed explained to Baljeet what her responsibilities were at Malabar. (Id. at 19.) When she was not paid for her work, Baljeet complained to Sayed. (Id. at 30.)

*Plaintiff Baljinder*

Baljinder worked at Malabar from January 2001 until August 2003 making bread, frying samosas, and washing dishes. (Baljinder Dep. at 14-16, 31, 116-17.) When she interviewed for the job, Baljinder spoke with Ali and Sayed; Sayed told her that she would be paid $400 per week, work twelve hours per day, and that she should begin work immediately. (Id. at 34-35.) Sayed and Ali gave her bread orders, and Sayed paid Baljinder. (Id. at 40.) Baljinder gave Sayed, Ali and Tariq a $6,000 loan to help pay for "the last payment . . . on the [Malabar] building." (Id. at 90-93.)

*Plaintiff Atul*

Atul worked at Malabar from about August 2001 until August 2003 as a waiter. (Atul Dep. at 111.) Ali, Sayed and Tariq interviewed Atul and hired him. They explained that he would work eleven or twelve hours per day, six days per week, and that he would be paid $300 per week plus tips. (Id. at 114, 116-19.) Atul reported to Ali and Sayed and spoke with them about the presentation of the food, the maintenance of the restaurant and the buffet, and details regarding parties at the restaurant. (Id. at 57-59, 128.) Ali usually paid Atul, and when Atul wished to take time off from work, he spoke with Ali and Sayed; Ali told him that he would be paid one-seventh less for every day that he missed work. (Id. at 136, 139-40.) On one occasion, Ali, Sayed and Tariq told Atul that they were in financial trouble, and Atul loaned money to them a few times. (Id. at 172-74.)

5

*Plaintiff Kameena*

Kameena, Plaintiff Atul's wife, worked at Malabar from June until August 2003. (Kameena Dep. at 27-28, 56, 101.) In June 2003, she interviewed with Ali and Sayed for a job doing office work. (Id. at 31-32.) On Kameena's first day, Ali and Tariq told her that she would work six days per week, ten hours per day, and be paid $8 per hour. (Id. at 37, 42, 100.) Ali paid her, Ali and Sayed set her schedule, and Ali, Sayed and Tariq gave her instructions on how to do her job. (Id. at 22-23, 52-53, 151, 188.)

*Plaintiff Vimla*

Defendants did not hire, fire, pay, direct, set schedules or wages, assign, maintain employment records or have any involvement in the employment of Vimla at Malabar. (Raju Dep. at 87; Raju Aff. ¶¶ 6-9; George Aff. ¶¶ 11-14; Carmo Dep. at 91-99; Carmo Aff ¶¶ 4-7; Thomas Aff. ¶¶ 7-10; Roy Aff. ¶¶ 3-6.)

<u>*Defendants*</u>

*Defendant Royal Arcadia*

Royal Arcadia is an Indian restaurant which opened in Malabar's location shortly after Malabar closed. Royal Arcadia incorporated in August 2003 and is owned by Defendants George, Raju, Thomas, and Carmo. (George Dep. at 115; George Aff. ¶ 4; Raju Aff. ¶ 4; Carmo Aff. ¶ 3; Thomas Aff. ¶ 3.) Plaintiffs claim that Roy is also an owner of Royal Arcadia. (Avtar Dep. at 98; Baljinder Dep. at 73-74.) Defendants contend that Malabar and Royal Arcadia were not associated and that Royal Arcadia's purpose was to make Indian Sweets. (George Dep. at 115; Raju Dep. at 61.) Plaintiffs claim that the supplemental rider to the lease signed between Royal Arcadia and the landlord, Albert, provided that Royal Arcadia would pay a total of

$45,000 to repay the back-rent debt amassed by Malabar. (Albert Dep. at 22-23.)[3]

Royal Arcadia sought a storefront in various neighborhoods in Queens and Brooklyn, and considered renting Malabar's kitchen at night to make sweets. (George Dep. at 110-17.) Defendants contend that it was only when Malabar closed that they decided to use the Malabar storefront, and that they did not speak with Albert about leasing the premises until then. (George Dep. at 169-70; Thomas Dep. at 54-55.) According to Plaintiffs, however, Defendants began negotiating the lease for Malabar's storefront in July 2003, one month before Malabar closed. Royal Arcadia signed a lease to rent the Malabar location in September 2003. (Albert Dep. at 17-18.)

Defendants state that the landlord, Albert, owned the equipment which was left in the restaurant. (Albert Dep. at 42.) They further contend that Royal Arcadia contracted to pay Albert $45,000 for the use of the kitchen equipment. (Declaration of Sangita A. Shah ("Shah Dec."), Ex. S (Supplemental Rider to Lease).) Plaintiffs counter that Albert did not own any of the Malabar equipment, and that the supplemental rider for the lease referred to payments of $5,000 per month for the rent which had been owed by Malabar. (Albert Dep. at 26-28, 37, 43-45.) Plaintiffs state that George told Albert, the landlord, that Royal Arcadia would pay the

---

[3] Defendants contest the admissibility of this fact. Specifically, they claim that Albert's belief that the rider was to assume the back-rent owed by Malabar was predicated upon a statement made by Albert's attorney, which, they claim, is inadmissable hearsay. (Def. Mem. at 17, n. 6.) Rule 801 provides that a "statement by a party's agent or servant concerning a matter within the scope of the employment, made during the existence of the relationship" is admissible for the truth of the matter asserted. Fed. R. Evid. 801(d)(2)(D). To the extent that Plaintiffs rely on a statement made to Albert by his attorney, it is admissible as a party agent's statement. In any event, Albert testified that George told him that Royal Arcadia would pay Malabar's back-rent (Albert Dep. at 21-22), which is admissible as a statement by a party opponent, Fed. R. Evid. 801(d)(2)(A).

back-rent owed by Malabar, and that he did pay a portion of the back rent upon signing the lease. (Id. at 22-23.)

Royal Arcadia's interior was not identical to Malabar's. Royal Arcadia had a bar, whereas Malabar did not; the bread kitchen that was used at Malabar was used as a storage room at Royal Arcadia; the table in Malabar's kitchen was cut in half; a door that was at Malabar had been closed off; Royal Arcadia installed new sound systems; and the tables in Royal Arcadia were different from those at Malabar. (Raju Dep. at 95; Tariq Dep. at 168; Manjit Dep. at 116; George Dep. at 339-41.)

According to Defendants, Malabar served different dishes from Royal Arcadia; specifically, Malabar served Indian food and "food that black people eat," whereas Royal Arcadia served Indian food but not "food that black people eat." (George Dep. at 130, 133-35; Tariq Dep. at 58-59, 61; Manjit Dep. at 117; Defendants' Rule 56.1 Statement ¶ 94.) Plaintiffs claim that Royal Arcadia served the same dishes as Malabar. (Tariq Dep. at 62-63; Manjit Dep. at 118.) Royal Arcadia is unaware of what happened to Malabar's documents when Royal Arcadia took over the premises. (George Dep. at 323.)

Defendants contend that only three employees were the same at Malabar as at Royal Arcadia (Manjit Dep. at 92; George Dep. at 338), but Plaintiffs state that the two restaurants did not keep accurate lists of employees, rendering it impossible to determine who worked at both restaurants. (See George Dep. at 164-70.)

*Defendant Raju*

From 1996 until the present, Raju owned and operated Kerala, a jewelry store which he owns. (Raju Aff. ¶ 2.) In 1999, Raju lent Karala's accountant, Defendant George, between

8

$20,000 and $25,000 with 20% interest. (Raju Dep. at 11-15, 24.) Defendants claim that Raju found out in 2000 that this money was given to Ali as a loan (id. at 29-30, 34-35), whereas Plaintiffs state that the loan was to Malabar Palace (Shah Dec. Ex. Q (DEF000298) (Malabar chart entitled 'Loans & Interest Payments)). George also lent money to Ali to build a house in India with a 20- or 30% rate of return. (George Dep. at 35.)

Defendants claim that, in an attempt to get back the money he lent to Ali, Raju visited Malabar approximately twice per month from 2000 until the restaurant closed. (Raju Dep. at 11-15, 28.) Plaintiffs allege that Raju visited Malabar from four to six times per month. (Atul Dep. at 29-30.)[4]

Defendants state that Raju did not hire, fire, direct, or set schedules or wages of employees at Malabar or Royal Arcadia, and that he never saw the employment records of those restaurants. (Raju Dep. at 84-85, 87; Kameena Dep. at 20.) Raju did not tell Ali or Sayed to get loans from Plaintiffs and did not tell Plaintiffs to give loans to them. (Raju Aff. ¶¶ 11-12.) Plaintiffs counter that Raju discussed wages, gave instructions, and lectured employees about their job performance. (Atul Dep. at 29-31, 34-35, 191-95.) Specifically, Raju directed the usage of products in the kitchen commissary, gave instructions to "try to improve [Malabar's] product to be presentable in the market," and supervised the presentation of the buffet. (Id. at 29-30.) Raju also spoke with Atul about Atul's failure to receive a paycheck. On one occasion, Raju responded to Atul's questions about his pay that "maybe this week the business is not good.

---

[4] Manjit saw Raju at Malabar once every two months but did not speak with him. (Manjit Dep. at 96-98.) Baljeet saw Raju at Malabar once a month, when he would walk through the kitchen with Ali. (Baljeet Dep. at 47-49.) Kameena saw Raju at Malabar three times per month. (Kameena Dep. at 116.)

9

Maybe next week you get paid in advance week. Get three checks instead of one." (Id. at 30-31.) Another time, Atul asked Raju about getting his money, and Raju told him to "forget about this." (Id. at 194-95.)

After Malabar closed, Plaintiff Atul and other employees went to Malabar to obtain valuables in compensation for the wages and loans that were outstanding. Raju went to Malabar that night to protect its valuables from the employees. (Id. at 41-42)

Raju gave George $15,000 to start Royal Arcadia. (Raju Dep. at 44-49, 53-54, 56-57, 62.)

*Defendant George*

George was Malabar's accountant, and was at the restaurant about once per month. (George Dep. at 16, 282; Baljeet Dep. at 49.)[5] Defendants claim that George did not have the power to hire, fire, direct, set schedules or wages for, or maintain employment records of Malabar's employees. (George Aff. ¶¶ 11-14.) Plaintiffs allege that George was introduced to the employees as one of the owners and partners of Malabar, that he maintained Plaintiffs' 1099 and W-2 tax forms, and that he discussed pay rates with Plaintiff Atul. (Atul Dep. at 151, 191-95, 198-99.) George also went to Malabar to protect its valuables when Atul and other employees attempted to take items from the restaurant as collateral for wages. (Atul Dep. at 41-42, 191-95; Baljeet Dep. at 48.)

George met with Defendants Roy and Raju in the summer of 2003 to discuss a proposal

---

[5] Baljinder saw George at Malabar once every two to three months. (Baljinder Dep. at 98, 105-06, 108-10.) Kameena knew the name George and had spoken with him several times when she had called Malabar, but could not place the name with a face. (Kameena Dep. at 16-17.)

to start Royal Arcadia. (George Dep. at 296-99.) George had seen Tariq at Malabar on several occasions, but was first introduced to him after the commencement of this suit. (Id. at 330.) George is an investor and owner of Royal Arcadia, and took steps to open Royal Arcadia before Ali and Sayed left the country by negotiating a lease for the Malabar premises in July 2003. (George Dep. at 109; Albert Dep. at 22-23.)

*Defendant Carmo*

In 2001, Carmo lent $25,000 to George to help Malabar. (Carmo Dep. at 67-69, 119-20.) Carmo did not interview, hire, fire, set wages for, and was not familiar with the work schedules of Malabar's employees. (Carmo Dep. at 91-99.) Carmo was at the restaurant "night and day." (Atul Dep. at 80.)[6] Several times per week, he would go to the kitchen and give instructions to the kitchen staff regarding the method by which to prepare his food. (Kameena Dep. at 21-23, 117.) On at least one occasion, he went to the kitchen and asked, "[W]hat's happening here?" He then said, "There are long lines, okay, let's get the bread rolling on this," and then directed Plaintiff Atul, a server, to make the bread. (Atul Dep. at 80-82.) Carmo was introduced to employees as an owner and partner of Malabar, and, on at least one occasion, he introduced himself as a "partner" of Malabar. (Avtar Dep. at 101; Baljinder Dep. at 52-54, 111.) He asked Plaintiff Kameena "as an employer" whether she was satisfied with her work and salary. (Kameena Dep. at 118.) He did not pay for his meals at Malabar. (Carmo Dep. at 84-85, 88-89.)

Defendants claim that Carmo did not know whether Malabar employees gave loans to Ali and Sayed. (Carmo Aff. ¶ 9.) Plaintiffs contend that because Carmo was present at Malabar

---

[6] Avtar does not know Carmo. (Avtar Dep. at 93.) Manjit saw Carmo at Malabar once every two months but did not speak with him. (Manjit Dep. at 96-98.) Baljeet saw Carmo at Malabar one or two times. (Baljeet Dep. at 50-51.)

11

when employees threatened to take tangible assets as collateral for their back wages and loans, he was aware that Plaintiffs were owed money. (See Atul Dep. at 41-42.)

*Defendant Thomas*

Thomas is Defendant George's brother-in-law. (Thomas Dep. at 19.) He had only been to Malabar less than five times and had met Ali and Sayed only once.[7] (Id. at 12, 44-45, 47.) Thomas had given Defendant George a $15,000 loan in 1999, for which Thomas was promised a 20% rate of return. (Thomas Dep. at 14-16, 60, 62, 68; George Dep. at 23.) Plaintiffs contend that the loan was to Malabar. (Thomas Dep. at 14, 88.) Thereafter, Thomas was introduced to Plaintiffs as one of the owners and partners of Malabar. (Kameena Dep. at 60; Baljinder Dep. at 52-54, 111.) In fact, Thomas had told employees that he was their manager, "[s]o whatever [he] said had to be followed out." (Kameena Dep. at 60.) Plaintiff Manjit believed Thomas to have been his boss. (Manjit Dep. at 100-01.) Plaintiff Baljinder knew that Thomas was one of the partners in Malabar Palace but did not remember him by face. (Baljinder Dep. at 111.) Thomas did not hire, fire, direct, set schedules or wages for employees or maintain Plaintiffs' employment records. (Thomas Aff. ¶¶ 7-10.) Thomas did not know whether Plaintiffs gave loans to Ali and Sayed. (Thomas Dep. at 14.)

In 2003, Thomas gave George $15,000 to invest in Royal Arcadia. (Id. at 22, 26-27.)

*Defendant Roy*

Defendants claim that Roy had neither been to Malabar nor met Ali until August 2003.

---

[7] Atul saw Thomas at Malabar a few times when Thomas was meeting with Raju and George. (Atul Dep. at 36, 202.) Avtar does not know Thomas. (Avtar Dep. at 93-94.)

(Roy Dep. at 39.) Plaintiffs state that he had been a partner of Malabar for eight years.[8] (Atul Dep. at 153; Avtar Dep. at 98.) Defendants further contend that Roy did not hire, fire, direct, or set schedules or wages for employees at Malabar, and did not maintain Plaintiffs' employment records. (Roy Aff. ¶¶ 3-6.) Plaintiffs claim that along with Ali, Roy interviewed Plaintiff Avtar and set her pay rate and schedule. (Avtar Dep. at 30-39.) On one occasion, Roy instructed Plaintiff Kameena that she had to change her clothing because it was "casual." He told her that she had to wear a white shirt and black pants in the restaurant. (Kameena Dep. at 58.) When Kameena objected that she had had a different arrangement with Ali and Sayed, Roy responded, "[i]t does not matter" because Roy was "the new boss," and Kameena had to "obey whatever he says." (Id. at 125.) About twelve times per day, Roy would tell employees what type of work to perform in the kitchen and how to handle daily tasks such as attending to customers. (Kameena Dep. at 58-59, 125, 173, 180.)

Defendants contend that Roy did not give money to Ali, Sayed, or Malabar. (Roy Aff. ¶ 9.) Plaintiffs state that Roy told employees, as well as local deli owner, Arun Vora ("Arun"), that he had "invest[ed]" $700,000 in Malabar. (Baljinder Dep. at 73-74; Arun Dep. at 47.)

Defendants contend that in August 2003, Roy visited Malabar for the first time for the purpose of viewing its kitchen. (Roy Dep. at 32.) Plaintiffs state that the lease was negotiated with Malabar in July 2003, and that therefore Roy would have not had any reason to evaluate its fitness as a location in August. (See Albert Dep. at 17-18.) Roy worked at Royal Arcadia from December 2004 until December 2006 managing the main floor and the sweets business. (Roy

---

[8] Baljeet knew Roy's name and remembered being introduced to him. (Baljeet Dep. at 49-50). Baljinder had spoken with Roy on several occasions at Malabar and knew him as "Sam." (Baljinder Dep. at 112.)

13

Dep. at 98-99, 128.)

## II.    Claims

Plaintiffs bring suit against Defendants alleging that: 1) Defendants misrepresented that they were going to pay the back wages and employee loans and that they were going to use the loans to improve Malabar; 2) Defendants failed to pay Plaintiffs the minimum wage in violation of FLSA § 206(a)(1); 3) Defendants failed to compensate Plaintiffs at overtime rates required by FLSA § 207(a)(1); 4) Defendants failed to pay Plaintiffs their wages in violation of NYLL § 191(1)(a); 5) Defendants failed to pay Plaintiffs minimum wage in violation of NYLL § 652(1), as actionable under NYLL § 663(1); 6) Defendants failed to compensate Plaintiffs for working overtime, in violation of NYLL § 650 and 12 N.Y Comp. Codes R. & Regs. ("NYCCRR") § 137-1.3; 7) Defendants did not compensate Plaintiffs in accordance with NYLL § 650 and 12 NYCCRR § 137-1.6 for any day in which they worked more than ten hours; 8) Defendants breached their contract with Plaintiffs by failing to repay loans Plaintiffs extended to Malabar; 9) Defendants breached their contract with Plaintiffs by failing to pay Plaintiffs' back wages; 10) in the alternative, if Defendants did not contract to repay Plaintiffs the loans, Defendants were unjustly enriched by Plaintiffs' loans; 11) in the alternative, if Defendants did not contract to pay Plaintiffs for their employment, Defendants were unjustly enriched by Plaintiffs' uncompensated labor.

## III.    Legal Analysis

### A.  Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), i.e.,

"[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "A fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law. An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz, 258 F.3d at 69 (internal quotations and citations omitted).

The moving party bears the burden of establishing the absence of a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). If the moving party has met this burden, then the non-moving party has the burden of "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal quotations and citations omitted); see also Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmovant can create a genuine issue of material fact only by citing competent, admissible evidence. Glasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 574 (S.D.N.Y. 2004) (citing Sarno v. Douglas Elliman-Gibbons & Ives, 183 F.3d 155, 160 (2d Cir. 1999)).

## B. Analysis

Defendants allege that all claims against all Defendants should be dismissed because of the defense of laches, and that all claims against Royal Arcadia should be dismissed because Royal Arcadia is not the legal successor to Malabar. They next claim that Defendants should be granted summary judgment with respect to Plaintiffs' FLSA claims because Malabar is not

15

entitled to enterprise coverage, Defendants were not Plaintiffs' employers for the purposes of the FLSA, and the claims are barred by the statute of limitations. Defendants challenge Plaintiffs' breach of contract claims, arguing that the contracts violate the statute of frauds, and Defendants were not a party to the contracts. Defendants claim that they should be granted summary judgment on the fraud-in-the-inducement claim because Defendants were not a party to the contracts, no fraudulent statements were made to induce Plaintiffs to enter into a contract, and the claim is duplicative of their FLSA claims. Finally, Defendants move for summary judgment on the unjust enrichment and quantum meruit claims, alleging that there is an adequate remedy at law, and Defendants did not receive money or services from Plaintiffs. I will discuss each claim in turn, but first I will address the evidence with respect to Plaintiff Vimla.

### 1.    Plaintiff Vimla

Before turning to the merits of Defendants' claims with respect to all other Plaintiffs, I must initially note that Plaintiffs have failed to cite to or provide to the court any evidence regarding any debts owed to, or breaches of contract affecting, Vimla. They have therefore failed establish any cause of action with respect to this plaintiff, and the court hereby dismisses Vimla as a plaintiff in this matter.[9] See Sarno, 183 F.3d at 160.

### 2.    All Claims

#### a.  Laches

Defendants next assert that summary judgment should be granted on all claims because Plaintiffs' delay in bringing this action "prejudiced Defendants' ability to file a cross-claim against Ali and Sayed." (Def. Mem. at 14.) In other words, Defendants assert a laches defense.

---

[9] All remaining Plaintiffs are hereinafter collectively referred to as "Plaintiffs."

Laches is "an equitable defense based on the . . . maxim vigilantibus non dormientibus aequitas subvenit (equity aids the vigilant, not those who sleep on their rights)." Stone v. Williams, 873 F.2d 620, 623 (2d Cir.), vacated on other grounds, 891 F.2d 401 (2d Cir.1989). "It bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." Ivani Contracting Corp. v. City of New York, 103 F.3d 257, 259 (2d Cir. 1997). The prevailing rule is that "when a plaintiff brings a federal statutory claim seeking legal relief, laches cannot bar that claim . . . where the statute contains an express limitations period within which the action is timely." Id. In this case, Plaintiffs seek monetary relief, i.e. "legal relief," see id., the FLSA explicitly contains a statute of limitations, and I do not find this action to be barred by that statute of limitations, see infra. In any event, Defendants point to nothing, nor has the court found anything during the course of its independent review of the record, to suggest that Plaintiffs unreasonably delayed filing their Complaint. Defendants' motion for summary judgment based on a laches defense is denied.

### b. Successor Liability

Defendant Royal Arcadia claims that it should be granted summary judgment on all claims because is not the successor to Malabar Palace and therefore cannot be held liable for Malabar's debts. (Def. Mem at 15-17.)

Under both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities. New York v. National Service Ind., Inc., 460 F.3d 201, 209 (2d Cir. 2006). Both New York law and traditional common law, however, recognize certain exceptions to this rule. A buyer of a corporation's assets will be liable as its successor if: (1) it expressly or impliedly assumed the

predecessor's liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations. See id. "Under the common law mere continuation theory, successor liability attaches when the plaintiff demonstrates the existence of a single corporation after the transfer of assets, with an identity of stock, stockholders, and directors between the successor and predecessor corporations." Graham v. James, 144 F.3d 229, 240 (2d Cir. 1998). See also Ladjevardian v. Laidlaw-Coggeshall, Inc., 431 F. Supp. 834, 839 (S.D.N.Y. 1977) (holding that "mere continuation" exception applies when there is "something in the nature of a corporate reorganization, rather than a mere sale").[10]

In determining whether a fraudulent conveyance occurred, courts look to what have been termed "badges of fraud," which are, among other factors: 1) a close relationship among the parties to the transaction; 2) a secret and hasty transfer not in the usual course of business; 3)

---

[10] Defendants argue that this court should adopt the successor-liability standard utilized in discrimination cases, citing two cases from outside the Second Circuit in support of this theory. (Def. Mem. at 15-16, citing Steinbach v. Hubbard, 51 F.3d 843 (9th Cir. 1995); Brock v. La Grange Equipment Co., 1987 U.S. Dist. LEXIS 14532 (D. Neb. 1987).) Specifically, Defendants urge that the following factors be considered: "1) whether the successor employer had notice of the complaint; 2) the predecessor's ability to provide relief; 3) whether there had been substantial continuity of business operations; 4) whether the successor uses the same facility; 5) whether the successor uses the same workforce; 6) whether the successor uses the same or substantially the same supervisory personnel; 7) whether the same jobs exist under substantially the same working conditions; 8) whether the successor uses the same machinery equipment and methods of production; and 9) whether the successor produces the same product." (Def. Mem. at 15, citing Abdel-Khalek v. Ernst & Young LLP, 1999 US Dist. LEXIS 2369, *7 (S.D.N.Y. 1999).) The Second Circuit has not specifically addressed which test should be applied in the FLSA context. It noted, however, that the factors considered in the CERCLA context constitute the "federal common-law" successor-liability test. New York v. National Services Ind., 460 F.3d at 209. Therefore, I find that that test is appropriately applied in the FLSA context. In any event, analyzing the facts according to the successor liability standard advanced by Defendants, their claim fails because there are triable issues of fact regarding each factor.

inadequacy of consideration; 4) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; 5) the use of dummies or fictitious parties; and 6) retention of control of the property by the transferor after the conveyance. See Shelly v. Doe, 671 N.Y.S.2d 803, 806 (App. Div. 3d Dept. 1998); MFS/SUN Life Trust v. Van Dusen Airport Services Co., 910 F. Supp. 913, 935 (S.D.N.Y. 1995).

"The traditional rule of corporate successor liability and the exceptions to the rule are generally applied regardless of whether the predecessor or successor organization was a corporation or some other form of business organization." 63 Am. Jur. 2d Products Liability § 117 (1984).

Here, Plaintiffs have adduced facts to support their contention that Royal Arcadia expressly or impliedly assumed Malabar's liability, was a mere continuation of Malabar, and was created to escape Malabar's obligations. Defendants were owners or investors in both Malabar and Royal Arcadia, and they were the only investors or owners in either restaurant other than Ali and Sayed. Furthermore, Defendants knew of Plaintiffs' debts since they heard Plaintiffs complain that they were neither being paid their salaries nor repaid their loans, and since Defendants defended Malabar's property from Plaintiffs upon Malabar's closing. Both restaurants prepared Indian food and used the same fixtures. And, Royal Arcadia negotiated a lease with Albert for Malabar's space in July 2003, before Malabar actually closed or announced any intention to close. Thus, it is reasonable to infer that Royal Arcadia was intended to serve as a mere continuation of Malabar for the purposes of escaping its obligations. Finally, Royal Arcadia assumed the back-rent debt of Malabar. Specifically, Albert explained that it was his understanding that the supplemental rider for the lease did not, in fact, provide terms for leasing

19

the restaurant equipment, but established that Royal Arcadia had assumed Malabar's back-rent without creating a record of explicitly having done so. See O'Connor v. 11 West 30th St. Rest. Corp., Nos. 94 Civ. 2951 (LMM), 93 Civ. 8895 (LMM), 1995 WL 354904 (S.D.N.Y. 1995) (holding that the defendant "impliedly agreed to assume [predecessor corporation's] liabilities by paying its arrears in rent" and therefore finding sufficient evidence to establish successor liability under debt-assumption and mere-continuation theories). Based upon all of these facts, a question of fact exists as to whether Royal Arcadia may be held liable as Malabar's successor.

Defendants claim that Albert's testimony about the true intent of the contract is not admissible because "[e]xtrinsic and parol evidence are not admissible to create an ambiguity in a written agreement that is complete and clear and unambiguous on its face," and "the Supplemental Rider contains no ambiguous terms." (Def. Mem. at 18-19.) In the first place, the parol evidence rule is generally applied to cases of contractual interpretation, i.e. breach of contract cases. In this case, the interpretation of the supplemental rider is not being admitted to resolve a contractual dispute, but rather it pertains to whether or not Royal Arcadia entered into a fraudulent agreement in order to continue the business of Malabar Palace while escaping the majority of its debts. In any event, "New York quite clearly rejects any strict application of the parol evidence rule when fraud is claimed." Centronics Financial Corp. v. El Conquistador Hotel Corp., 573 F.2d 779 (2d Cir. 1978); see Millerton Agway Co-op. v. Briarcliff Farms, Inc., 17 N.Y.2d 57, 61 (N.Y. 1966). I therefore reject Defendants' argument.

### 3.    FLSA

Defendants challenge Plaintiffs' claims two (FLSA minimum wage violation) and three (FLSA overtime-wage violation), on three separate theories: 1) that Malabar is not entitled to

enterprise coverage under the FLSA; 2) Defendants are not employers as defined by the FLSA; and, 3) the claims are barred by FLSA's statute of limitations. I will address each in turn.

### a. FLSA coverage

Defendants challenge the applicability of the FLSA to Defendants, Plaintiffs, and Malabar. Specifically, Defendants claim that Malabar is not entitled to enterprise coverage because there is no evidence that it had gross revenues of over $500,000. (Def. Mem. at 3.)

An individual is covered by FLSA if he or she is employed by an "enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. §§ 203(s)(1), 206(a), 207(a)(1). An enterprise is "engaged in commerce" if it "has employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person and . . . [its] annual gross volume of sales made or business done is not less that $500,000." 29 U.S.C. § 203(s)(1). The term "enterprise" in the context of the statute means "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose." 29 U.S.C. § 203(r).

There is no evidence in the record establishing that Malabar's business revenues exceeded $500,000 for the time period at issue.[11] Plaintiffs allege that the loans they, and others, extended to Malabar were more than $500,000 and should be deemed part of Malabar's business.

---

[11] Defendants provided to this court unsigned tax returns from 1998 through 2000, indicating that Malabar earned less than $500,000 in total gross income over the course of those three years. (George Aff. Attachment 1.) The parties dispute the admissibility of these records because they are unsigned. Even assuming that those records are not admissible, Plaintiffs' claim for enterprise coverage fails. Therefore, the court need not reach the issue of the tax returns' admissibility.

(Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Corrected Version) ("Pl. Mem.") at 4-5.) Specifically, they rely on <u>Boekemeier v. Fourth Universalist Soc'y</u>, 86 F. Supp. 2d 280, 286 (S.D.N.Y. 2000), which noted that "charitable income, investment income, income from the gain on sale of investments, and miscellaneous income" which are "sufficiently related" to the enterprise's business may be included in the gross volume amount. There is nothing in <u>Boekemeier</u> to suggest that investments in an enterprise, as opposed to income derived from the enterprise's investments, should be considered as part of the business's annual gross sales, nor has the court found any other support in this circuit to support this proposition. Because Plaintiffs have provided no evidence that Malabar conducted business of more than $500,000, Malabar does not qualify for enterprise coverage for the purposes of the FLSA.

Even if an enterprise is not found to be covered by the FLSA, however, individuals of the corporation nevertheless may be. Under the FLSA's individual coverage provision, any employee "engaged in commerce or in the production of goods for commerce" is covered by the FLSA, irrespective of whether his or her employer is an enterprise engaged in commerce as statutorily defined. 29 U.S.C. §§ 206(a), 207(a)(1); <u>see</u> <u>Brennan v. Arnheim & Neely, Inc.</u>, 410 U.S. 512, 516-17 (1973).

The FLSA's individual coverage provision provides that any individual employee "engaged in commerce or in the production of goods for commerce" is covered by the FLSA, regardless of whether his or her employer is an enterprise. 29 U.S.C. § 203(r)(1). According to the Department of Labor, individual employees are engaged in commerce "when they are performing work involving or related to the movement of persons or things (whether tangibles or

intangibles, and including information and intelligence)" between states. 29 C.F.R. § 779.103. For example, an employee could be engaged in commerce by regularly using the mail or the telephone between states, or traveling across state lines. Id.; see also Bowrin, 417 F. Supp. 2d at 465. A "substantial part" of the employee's work must be related to interstate commerce. Walling v. Jacksonville Paper Co., 317 U.S. 564, 572 (1943); Skidmore v. John J. Casale, Inc., 160 F.2d 527 (2d Cir. 1947); see, e.g., Remmers v. Egor, 332 F.2d 103, 104 (2d Cir. 1964) ("[S]poradic or occasional shipments of insubstantial amounts of goods are insufficient to bring an employee within the coverage of the act.").

Here, Plaintiffs established that Malabar sent goods through interstate commerce. Atul stated specifically that Malabar prepared food such as bread for distribution and sale to vendors in Connecticut and New Jersey. (Atul Aff. ¶¶ 3, 4.) And, Plaintiffs testified that they worked at the restaurant assisting in the production of items such as bread. The court notes that the present record does not disclose the amount of work done by Plaintiffs on items which were sent into interstate commerce. Whether it was a substantial part of Plaintiffs' activities will be one of the issues to be proved at trial.

### b. Employer Status

Defendants next claim that they were not Plaintiffs' employer for the purposes of the FLSA because they did not hire, fire, supervise Plaintiffs, nor did they control Plaintiffs' work schedules, conditions of employment, rates of pay, or employment records. (Def. Mem. at 4-12.)

The FLSA defines "employer" in broad terms, and therefore it offers little guidance on whether or not a given individual is an employer. In answering that question, the overarching concern is whether the alleged employer possessed the power to control the workers in question,

23

see Carter v. Dutchess Community College, 735 F.2d 8, 12 (2d Cir. 1984), with an eye to the "economic reality" presented by the facts of each case, Goldberg v. Whitaker House Coop., 366 U.S. 28, 33 (1961). Under the "economic reality" test, the relevant factors include "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Carter, 735 F.2d at 12 (citation omitted).

No single factor standing alone is dispositive. See Brock v. Superior Care, 840 F.2d 1054, 1059 (2d Cir. 1988). Instead, the "economic reality" test encompasses the totality of circumstances, and any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition. See Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947) (holding that whether an employer-employee relationship exists does not depend on isolated factors but rather "upon the circumstances of the whole activity").

Indeed, to qualify as an 'employer' for the purposes of the FLSA "does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees." Herman v. RSR Security Services Ltd., 172 F.3d 132, 139 (2d Cir. 1999). "Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control do[ ] not diminish the significance of its existence." Id. (internal quotations and citations omitted). "[T]he overarching concern is whether the alleged employer possessed the power to control the workers in question," and the court must evaluate the "totality of the circumstances" to determine whether a defendant had "operational control." Id. at 139-40.

24

*Raju*

Construing the facts in the light most favorable to Plaintiffs, Raju went to Malabar between four and six times per month. At least once per month, Raju would walk through the kitchen with Ali. During his visits to Malabar, Raju gave instructions to the staff as to how to do their job. Specifically, he directed the staff as to the usage of kitchen products, the appearance of the buffet, and the presentation of food. Drawing all reasonable inferences from the evidence, Raju maintained control over employee remuneration. Atul spoke with Raju on a number of occasions about the fact that he had not received a paycheck. Rather than direct Atul to speak with another individual or claim that he had no knowledge or control over employee payment, Raju responded to Atul's queries. On one occasion, he indicated that Atul would be paid on a later date when business was improved, and on another occasion, he indicated that Atul would not receive the money he was owed. Therefore, I find that the totality of the circumstances permits the inference that Raju maintained "operational control" over Malabar, and there is a question of fact to be resolved at trial as to whether Raju maintained organizational control over Malabar.

*George*

George went to Malabar about once per month. Atul had discussed with George on several occasions the fact that he had not been paid. On at least one occasion, George responded that Atul would not receive the money he was owed.[12] And, George maintained control over

---

[12] Defendants counter that on another occasion, George responded that Atul should speak with Ali, which indicates that George did not maintain control over Plaintiffs' wages. (Def. Mem. at 9.) The evidence shows that Atul spoke with George about his wages on many occasions. (See Atul Dep. at 166-67.) That George once directed Atul to speak with someone else about being paid is not dispositive of George's control over Atul's wages.

employees' financial records. Therefore, I find that there is a question of fact to be resolved at trial as to whether George maintained organizational control over Malabar.

### Carmo

Carmo visited Malabar frequently and would often give the kitchen staff instructions on how to prepare his meals. On at least one occasion, he noted that there was a problem regarding the production of bread for the restaurant, and he ordered Atul, who was normally a waiter, to assist in making the bread. Carmo also asked at least one employee "as an employer" whether she was satisfied with her work and salary, implying that he had the ability to alter these conditions of employment were she unsatisfied. Therefore, there is a question of fact to be resolved at trial as to whether Carmo maintained organizational control over Malabar.

### Thomas

Although there is not much information in the record regarding Thomas' control over the employees, Kameena testified that Thomas "said [he] w[as] the new manager[]. So whatever [he] said had to be followed." (Kameena Dep. at 60.) It is unclear from her testimony whether Thomas instructed the staff that "whatever [he] said had to be followed," or if that statement merely reflects Kameena's impression of Thomas' role in the restaurant. Either way, however, a question of fact is presented regarding whether Thomas maintained control over the staff in a way that would qualify him as an employer for the purposes of the FLSA.

### Roy

Roy was frequently at Malabar and often gave instructions to the staff as to how to perform their daily tasks and what to wear in the restaurant. Moreover, he specifically told Kameena that he was "the boss," and that she had to follow his instructions. Furthermore, Roy

was present at Avtar's interview and, along with Ali and Sayed, set her wage and work schedule. Therefore, there is a question of fact to be resolved at trial as to whether Roy maintained organizational control over Malabar.

### c. Statute of Limitations

Defendants next contend that because the Complaint was filed two years and two months after Plaintiffs' termination at Malabar, their FLSA claims are barred by the statute of limitations. (Def. Mem. at 13.) According to 28 U.S.C. § 255(a), (b), any claim arising under the FLSA is subject to a two-year limitations period, unless the cause of action arose from "a willful violation," in which case the statute of limitations is three years. The term "willful" is not specifically defined in the FMLA. In McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988), the Supreme Court held that an employer acts willfully under the FLSA when he or she "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." The McLaughlin Court added that "[i]f an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful . . . . If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then . . . it should not be . . . considered [willful.]" Id. at 135 n.13.

Whether Defendants acted willfully in violating the FLSA is a question of fact for the jury. Plaintiffs adduced evidence that they had complained to Defendants that Plaintiffs had not received their wages. Based on that evidence, a reasonable jury could find that Defendants knew or recklessly disregarded the fact that Plaintiffs were not being paid in accordance with the FLSA. Because a determination of which statute of limitation applies is dependent upon whether Defendants acted wilfully – a question of fact for the jury – I decline to grant summary judgment

27

on that ground.

### 4. Contract Claims

#### a. Statute of Frauds

Defendants contend that Plaintiffs' claims eight (breach of contract for loan-repayment) and nine (breach of contract for back-wages) should be dismissed because the contracts violated the statute of frauds. (Def. Mem. at 25.) Specifically, Defendants allege that the oral contracts were not to be performed within one year of their making. (Id.; Def. Reply Mem. at 22.) Plaintiffs state that because Manjit was told that he was to be repaid within six months, the contract claims do not violate the statute of frauds. (Pl. Mem. at 32.) The court notes that other than this argument, Plaintiffs have neither conceded that all of the other contracts at issue violated the statute of frauds, nor have they provided briefing to the court which is responsive to Defendants' arguments.

According to New York State law, an agreement which is not in writing is void if, by its terms, it "is not to be performed within one year from the making thereof." New York General Obligations Law § 5-701(a). Plaintiffs have adduced evidence that Manjit was to be repaid his loan within six months, but have not provided evidence regarding the other Plaintiffs. Therefore, Defendants' motion with respect to Manjit's eighth claim (breach of contract for loan-repayment) is denied. Summary judgement with respect to the other Plaintiffs' eighth claim (breach of contract for loan repayment) is granted. Because Plaintiffs have adduced no evidence regarding the time-frame in which Plaintiffs were to repaid their back-wages, Defendants' motion for summary judgment as to Plaintiffs' ninth claim (breach of contract for back-wages) is granted.

28

### b. Agency

Defendants move for summary judgment on the remaining contract claim, claim eight (breach of loan-repayment contract), asserting that they cannot be held liable for Ali and Sayed's contracts with Plaintiffs. Specifically, they claim that Ali and Sayed were never their agents, because they did not have Defendants' actual or apparent authority to act. (Def. Mem. at 18-22.) A reasonable jury could find that Defendants were partners with Ali and Sayed, however, and Defendants' claim consequently fails.

Under New York State law, a partnership "is an association of two or more persons to carry on as co-owners a business for profit." New York State Partnership Law § 10(1) (McKinney 2007). "Every partner is an agent of the partnership for the purpose of its business, and the act of every partner . . . binds the partnership," and all partners are liable "[j]ointly and severally for everything chargeable to the partnership. . . ." Id. §§ 20(1), 26(a)(1). In determining whether a partnership exists, "[t]he receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business," unless the profits were received, *inter alia*, in payment of a debt or as interest on a loan. Id. § 11(4)(a), (d). "Among the factors to be considered in determining whether a partnership was created are the intent of the parties (express or implied), whether there was joint control and management of the business, whether there was a sharing of the profits as well as a sharing of the losses, and whether there was a combination of property, skill or knowledge." Cleland v. Thirion, 704 N.Y.S.2d 316, 316 (App. Div. 3d Dept. 2000) (citations and quotations omitted); see Boyarsky v. Froccaro, 516 N.Y.S.2d 775, 775 (2d Dept. 1987). Also to be considered is whether the parties made a contribution of capital to the venture. See Falk v. 569 Broadway Assocs., 607 N.Y.S.2d 17, 17

(App. Div. 1st Dept. 1994) ("Having made no contribution of capital, plaintiff did not become a partner"); Bereck v. Meyer, 635 N.Y.S.2d 15, 16 (App. Div. 1st Dept. 1995) (granting summary judgment where plaintiff offered no evidence he "contributed to the capital of this alleged partnership, was to share in its losses, or exercised direct control over its day-to-day operations.")

Here, based on Plaintiffs' testimony that Defendants stated that they were owners of Malabar, and Ali and Sayed's statements that Defendants were owners of Malabar, a jury could conclude that Defendants intended to become partners of Malabar. Further, there is sufficient evidence to present a question of fact for the jury to determine whether or not Defendants jointly controlled and managed the business, as outlined *supra*. Defendants also provided capital for Malabar to Ali and Sayed. Defendants claim that the money was provided as loans to Malabar, and they sought to obtain the money back but were unsuccessful. However, Ali, Sayed, and Defendants' statements that Defendants were owners of Malabar permit the inference that the money was actually not provided as loans but rather as an investment of capital in the business. Furthermore, given the facts in this case, it is reasonable to infer that Defendants sought money from Ali and Sayed for their investment, but they were never paid because Malabar was not profitable. Thus, there is a question of fact for the jury to determine as to whether or not Defendants' both shared in the losses and stood to gain from the profits of the business. Finally, there is evidence to show that Defendants provided a combination of property, skills, and knowledge to Malabar. For instance, according to the evidence presented, George did Malabar's accounting, Raju gave instructions on the appearance of the buffet, Carmo gave instructions on the preparation of the food, and Roy gave instructions to the staff on how to dress in the restaurant.

A jury could plausibly find that Defendants were partners with Ali and Sayed in Malabar's business, and therefore there is a question of fact for the jury to decide whether Defendants may be held accountable for the contracts entered into by Ali and Sayed in order to obtain money from Plaintiffs. Defendants' motion for summary judgment on claim eight (breach of loan-repayment contract) is therefore denied.

### 5. Fraud-in-the-Inducement Claim

#### a. Agency

Defendants argue that summary judgment should be granted with respect to claim one (fraud-in-the-inducement) because they cannot be held liable for Ali and Sayed's fraudulent statements to Plaintiffs. Specifically, they claim that Ali and Sayed were never their agents, because they did not have Defendants' actual or apparent authority to act. (Def. Mem. at 18-22.) For the reasons outlined in Section III(B)(4)(b), *supra*, this claim is denied.

#### b. Fraudulent Statements

Defendants next claim that they should be granted summary judgment on the fraud-in-the-inducement claim because "there is no evidence that Sayed made any misrepresentations about the purpose for the loans." (Def. Mem. at 20.) The evidence suggests the contrary, however. According to Baljinder, she gave money to help pay for "the last payment . . . on the [Malabar] building." (Baljinder Dep. at 90-93.) Manjit gave money to Ali and Sayed based on their statements that the money would be used to expand Malabar. (Manjit Dep. at 46-48.) Avtar gave them money because she had been told that it would be used as a "payment for the [Malabar] building." (Avtar Dep. at 13, 54, 80-82.) Based on the evidence of Malabar's substantial rent arrearage, and the fact that Malabar never attempted to expand its business

31

(except perhaps in the form of Royal Arcadia, which Defendants dispute), there is evidence that Plaintiffs provided money to Malabar based on fraudulent statements. Defendants' claim is denied.[13]

<h3 align="center">c. Duplicative Claim</h3>

Defendants next argue that Plaintiffs' fraud claim (claim one) is duplicative of their FLSA claims related to back-wages (claim two) and over-time wages (claim three), and that claim one should therefore be dismissed. (Def. Mem. at 20.) Plaintiffs argue that the fraud claim is solely predicated on the non-payment of Plaintiffs' loans and not back-wages or overtime-wages. The Complaint states that Defendants made material misrepresentations that "they intended to repay the Back Wages and the Employee Loans." (Compl. ¶ 46.)

The law is unsettled as to whether the FLSA preempts state common law claims. "Courts considering this issue analyze whether the FLSA and common law claims are grounded in the same facts." Chen v. Street Beat Sportswear, Inc., 364 F. Supp. 2d 269, 292-293 (E.D.N.Y. 2005). To the extent that Plaintiffs assert a fraud claim pertaining to back-wages, it appears to be premised upon the same facts as the FLSA claim, to wit, that Defendants failed to repay the money they were owed. See id. Because the facts underlying the two claims are the same, and because Plaintiffs now assert that they are advancing only the fraud claim with respect to the non-repayment of loans, Plaintiffs' fraud claim specifically pertaining to back-wages is

---

[13] Defendants also argue that Plaintiffs' Complaint is deficient for failing to state the fraudulent statements with specificity. Specifically, they claim that Plaintiffs failed to allege what the statements were, where and when the statements were made, and why the statements were fraudulent. (Def. Reply Mem. at 23-24.) Discovery is complete in this case, and based upon the facts presented to the court, Defendants clearly know of the circumstances surrounding the statements at issue despite the alleged deficiency in the Complaint. Therefore, the court declines to dismiss the Complaint on that basis on summary judgment review.

32

dismissed. Plaintiffs' fraud claim predicated on the repayment of loans is not duplicative of the FLSA claims and summary judgment is denied.

### 6. Unjust enrichment

Finally, Defendants move for summary judgment on claims ten (unjust enrichment) and eleven (quantum meruit), claiming that there is an adequate remedy at law and that Defendants did not receive money or services from Plaintiffs. (Def. Mem. at 22-23.) Plaintiffs assert both claims in the alternative to the FLSA and contract claims, so that those claims would only be adjudicated if the FLSA and contract claims were dismissed and there was no adequate remedy at law. (Compl. ¶¶ 97, 102.) Furthermore, as noted *supra*, an issue of fact remains as to whether Defendants were in a partnership with Ali and Sayed, and therefore whether Defendants received the benefits of Plaintiffs' services and loans without compensation. Defendants' claim is therefore denied.

## IV. Conclusion

Defendants' motion for summary judgment as to Plaintiff Vimla is GRANTED as to all claims. Defendants' motion for summary judgment as to claim nine (breach of contract for back-wages) is GRANTED. Defendants' motion for summary judgment as to claim eight (breach of contract for loans) pertaining to all Plaintiffs but Manjit is GRANTED. Defendants' motion for summary judgment on all other claims is DENIED.


SO ORDERED.

Dated: December 21, 2007
      Brooklyn, N.Y.

/signed/
_____
Nicholas G. Garaufis
United States District Judge